# In the United States Court of Federal Claims

No. 21-568
(Filed:  20 January 2022)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SUNREZ CORPORATION, | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

Breach of Contract; Contract Interpretation; Implied Duty of Good Faith and Fair Dealing; SBIR Contract; Motion to Dismiss for Failure to State a Claim; Declaratory Relief; Regulatory Taking.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bryant S. Banes*, with whom were *Sean D. Forbes*, and *Sarah P. Harris*, all of Neel Hooper & Banes, P.C., of Houston, TX, for plaintiff.

*David M. Kerr*, Trial Attorney, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, *Elizabeth M. Hosford*, Assistant Director, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, of Washington, DC, and *Isabelle P. Cutting*, Trial Attorney, with whom was *Maj. David Gilkes*, Trial Attorney, U.S. Air Force, Civil Law/Acquisition and Fiscal Law and Litigation, of Joint Base Andrews, MD, for defendant.

## OPINION AND ORDER

HOLTE, Judge.

Plaintiff Sunrez Corporation entered a Small Business Innovative Research contract with the United States Air Force to develop air-cargo pallets.  Plaintiff brings this action under the Contract Disputes Act, 41 U.S.C. § 7104(b)(1), accusing the government of breach of contract, and breach of the duty of good faith and fair dealing.  Plaintiff further brings a claim for declaratory relief under 28 U.S.C. § 1491, requesting the Court declare its pallet met the Contract's deliverables and should receive Air Transportability Test Load Activity certification. Plaintiff also brings a takings claim under the Tucker Act, alleging the government's actions constitute compensable takings under the Fifth Amendment of the United States Constitution. The government moved to dismiss the case pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims.  For the following reasons, the Court grants-in-part, denies-in-part, and stays-in-part the government's motion to dismiss for failure to state a claim.

## I.     Background

The Court draws the following facts from plaintiff's complaint and response to the government's motion to dismiss. *See United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006) (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1314–15 (Fed. Cir. 2006)) ("In reviewing a dismissal for failure to state a claim, we must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant.").

## A. Factual History

Sunrez is a small business contractor which, in 2006–08, completed Small Business Innovative Research ("SBIR") FA820-06-P-0957 ("0957 contract") on Blast Resistant Composite Panels for Composite Tactical Shelters. Pl.'s First Am. Compl. and Req. for Relief ("Am. Compl.") at 4, ECF No. 8. According to the 0957 contract, Sunrez studied a composite 463L pallet design and "[u]sing internal research and development funds, Sunrez developed an all new rail system, fiber reinforced core, and manufacturing method for assembling the novel thermoplastic-based pallet." Am. Compl. at 4. 463L pallets are standardized air-cargo pallets used by the United States Air Force ("USAF") for loading and deploying up to 10,000 pounds of cargo. Am. Compl. at 3. In 2012 and 2013, Sunrez discussed a composite 463L pallet design with groups at Warner Robins Air Force Base ("WRAFB"), and as talks progressed, Sunrez used "internal research and development finances to begin developing new composite pallet components and an all-new load bearing rail system." Am. Compl. at 4. On 26 September 2013, Sunrez and the USAF executed SBIR Contract FA8501-13-C-0042 ("0042 contract") in which "Sunrez was tasked with baselining the performance of the Legacy [463L] pallet via Finite Element Analysis ('FEA') and physical testing." Am. Compl. at 5. Near the end of the 0042 contract, "Sunrez began negotiating the terms of the Work Plan for" the Contract at issue in this case. Am. Compl. at 6. One contentious topic was whether Sunrez would "provide a Level III Technical Data Package ('TDP')." Am. Compl. at 6. The government ultimately accepted "Sunrez's 'Draft' TDP language and the contract was executed." Am. Compl. at 6–7.

On 26 March 2014, Sunrez was awarded SBIR Contract No. FA8501-14-C-0013 ("0013 contract" or "the Contract"), Am. Compl. at 1, through which the USAF paid Sunrez $1,488,250.56 to develop and deliver six prototypes of an alternative 463L pallet design using new composite technologies, *see* Ex. 1 at 2 ("Contract"), ECF No. 18. Although Sunrez mentions several contracts in its Amended Complaint, the parties agree the only contract at issue in this case is the 0013 Contract, so the Court refers to this as "the Contract." Transcript ("Tr.") at 11:16–22, ECF No. 26 (Transcript of Oral Argument on 28 September 2021) ("THE COURT: So when we refer to the contract, we're on the same page with the 26 March 2014 document . . . SBIR contract 0013, that's the contract? [PLAINTIFF]: Yes, Your Honor. THE COURT: . . . . And the Government agrees with that? [GOVERNMENT]: We agree, Your Honor."). The Contract specifies a twenty-four-month performance period from 26 March 2014 through 24 March 2016. Am. Compl. at 6–7. Although the parties entered the Contract 26 March 2014, "Sunrez had already developed preliminary designs on a new 463L pallet." Am. Compl. at 4; *Id.* ("Sunrez can prove this technology was developed before entering into any written contract with the USAF because 3D CAD files and 3D printed models had already been produced.").

The first item in the Contract's Schedule provides Sunrez was to "Develop and Deliver prototype composite 463L pallet system [in accordance with] work plan dated 06 March 2014." *See* Contract.  A few relevant provisions of the Work Plan are:  Section 3.0, Section 5.0, and Section 6.3.  *See* Am. Compl. at 8–9 n.5; *see also* Ex. 1 at Ex. 2 ("Work Plan").  The Scope provision of the Work Plan, Section 3.0, states, "Airworthiness Certification and Air Transportability Requirements will be met through compliance to MIL-DTL-27443F."  Am. Compl. at 9 n.5 (quoting Work Plan at 2).  Section 5.0 of the Work Plan provides one of the milestones for the Contract is "Pallet build for Certification Testing."  Am. Compl. at 9 (quoting Work Plan at 6).  Section 6.3 "Deliverables" reads, "Contractor will provide delivery of 6 full scale complete assemblies of the new composite 463L pallet for certification testing to Robins Air Force Base."  Work Plan at 9.

Despite the Contract's "Draft" TDP language, the government repeatedly requested Level III data.  Am. Compl. at 7.  Sunrez denied USAF requests for Level III data stating this Contract is a product development contract, not a production contract, and the government later concluded "the Level III data it had been seeking from Sunrez was inappropriate for the Contract."  Am. Compl. at 7 (citing Ex. 1 at Ex. 3 ("Aug. 2014 Trip Report")).  Less than two months later, however, in a 15 October 2014 email, the government "expressed its growing displeasure with Sunrez's use of the term 'proprietary' in the monthly reports to the Government."  Am. Compl. at 7 (citing Ex. 1 at Ex. 4 ("October 2014 Emails")).  Sunrez "rebuffed the pressure and continued performing according to the terms of the Contract."  Am. Compl. at 8.  Sunrez performed some pallet tests at its own facility while larger tests required by the MIL-DTL-24733F specification were performed at WRAFB.  Am. Compl. at 8.  On 4 June 2016 and 25 July 2016, "Sunrez delivered its prototype composite pallets."  Am. Compl. at 8.  Delays with government testing then "required several contract modifications, extending the Contract's period of performance to December 31, 2017."  Am. Compl. at 9.  Sunrez refused to sign the government's 13 July 2017 memorandum of understanding which stated "[b]efore SBIR III effort can be awarded, the draft TDP needs to be delivered and accepted by the Government."  Am. Compl. at 9; Ex. 1 at Ex. 5 ("MOU").  The Work Plan Task 4 states, "A Draft Technical Data Package (TDP) sufficient to allow competitive re-procurement and spares procurement shall be initiated for the new design at the completion of the Phase II effort."  Am. Compl. at 11 (emphasis omitted); Work Plan at 3.

On 18 August 2017, the Contract was modified to include an SBIR data rights clause which grants the government "[l]imited rights in such SBIR technical data."  Ex. 6 ("18 August 2017 Modification") at 1, 5, ECF No. 8-5.  On 22 November 2017, CO Renfroe emailed Sunrez's Mark Livesay stating, "[m]y assumption is [the Contract] is a Phase II.5."  Ex. 1 at Ex. 6 ("Renfroe Email").  CO Renfroe further stated:  "In the end we have extremely dropped the ball on this effort, in my opinion.  The government's intent with all SBIR efforts is to form a lasting partnership with the small businesses.  I feel like we have been less than stellar partners in this case."  Renfroe Email at 1.  "In the end, it took eighteen (18) months for WRAFB to complete the full-scale pallet tests, pushing well past the Contract's deadline."  Am. Compl. at 10.  Sunrez notes they were unable to speak with anyone at WRAFB in the final weeks of the Contract's performance period and "Sunrez never received any feedback on either their delivered Final Report (*See* Exhibit 8) or their Final Draft TDP."  Am. Compl. at 10.  The parties finally met for an "outbriefing" in March 2018, three months after the Contract expired.  Am. Compl. at

10–11.  In this meeting, Sunrez learned WRAFB did not accept the Ring Capacity 3 Test internally performed by Sunrez and "that the Draft TDP delivered in December 2017 was unacceptable because the drawings were not in the proper format." Am. Compl. at 11.

The Air Force did not move forward with Sunrez's composite prototype and instead chose an all-aluminum pallet by another contractor.  Am. Compl. at 16.  Notably, the government did not submit Sunrez's prototype pallets for Air Transportability Test Load Activity ("ATTLA") certification.  Am. Compl. at 13.  While Sunrez admits "[t]he Government is correct that there was no promise of a Phase III SBIR contract," Am. Compl. at 17; Pl.'s Resp. at 13, Sunrez showed the Court a letter from USAF Lieutenant Colonel Jack W. Flynt III to United States House of Representatives Honorable Duncan Hunter wherein Mr. Flynt refers to the Contract "as a Phase II.5 SBIR." Ex. 7 at 1 ("Flynt Letter"), ECF No. 8-6.  At oral argument, however, plaintiff, confirmed the Contract does not anywhere state it is a Phase II.5 contract. *See* Tr. at 13:7–9 ("THE COURT:  . . . .  Just to confirm, does the contract or the work plan state 2.5 anywhere?  [PLAINTIFF]:  Those words do not appear in it.").

## B.  Procedural History

On 18 September 2020 plaintiff submitted a certified claim to Mr. Carlos S. Renfroe ("Renfroe"), the Contracting Officer ("CO") for the Contract at that time, for $132,000,000.00 under the Contracts Disputes Act ("CDA").  Am. Compl. at 1.  On 10 November 2020 the new CO for the Contract, Mr. Jesse Schwarztrauber ("Schwarztrauber"), issued a Contracting Officer's Final Decision ("COFD") denying plaintiff's entire claim.  Am. Compl. at 2.  Sunrez now appeals the COFD decision for de novo review in this Court.  *See* Am. Compl.

On 2 April 2021, Sunrez filed an amended complaint with seven attached exhibits.  *See* Am. Compl.  Plaintiff alleges four causes of action:  (1) the "USAF's refusal to submit Sunrez's composite pallet design to the ATTLA for airworthiness certification constitutes a material breach of the Contract," Am. Compl. at 18; (2) "the Government engaged in numerous breaches designed to hinder Sunrez's performance of the Contract and impermissibly retaliate against Sunrez for refusing to give up its rights," Am. Compl. at 19; (3) "the [g]overnment is liable to Sunrez for its regulatory taking of Sunrez's property without just compensation," Am. Compl. at 25; and (4) Sunrez "requests a declaration that its composite pallet met all of the Contract's deliverables and that the Government is required to properly submit same for ATTLA certification," Am. Compl. at 26.  The Court then granted plaintiff's motion for leave to file Exhibits 2–5 and Exhibit 8 under seal.  *See* Order, ECF No. 10.  On 12 April 2021, the Court granted plaintiff's unopposed motion for leave to file exhibit 1 under seal, *see* Order, ECF No. 17, and two days later, Sunrez filed Exhibit 1 under seal, *see* Ex. 1.  Exhibit 1 is sixty-four pages and includes eight sub-sections.  *See* Ex. 1.

On 19 April 2021, the government filed motion to dismiss plaintiff's first amended complaint pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").  *See* Def.'s Mot. to Dimiss Pl.'s First Am. Compl. and Req. for Relief ("Def.'s MTD"), ECF No. 19. The government argues Sunrez's complaint fails to state a claim upon which relief may be granted because the Contract does not require ATTLA to certify the prototype pallets for airworthiness.  *See id.*  On 17 May 2021, plaintiff responded by arguing the government's

motion to dismiss should be denied as plaintiff plausibly states a claim upon which relief may be granted.  *See* Pl.'s Opp'n to the Gov't's Mot. to Dismiss ("Pl.'s Resp."), ECF No. 20.  The government filed a reply on 1 June 2021 arguing Sunrez's response fails to refute any of the government's assertions in its motion to dismiss.  *See* Def.'s Reply in Support of its Mot. to Dismiss Pl.'s First Am. Compl. and Req. for Relief ("Def.'s Reply"), ECF No. 21.  On 28 September 2021, the Court held oral argument on the government's motion to dismiss pursuant to RCFC 12(b)(6).  *See* Order, ECF No. 23.

## II.    The Parties' Arguments Regarding the Government's Motion to Dismiss

In support of its RCFC 12(b)(6) motion to dismiss, the government contends, "because Sunrez's research and development contract does not require the Government to certify Sunrez's prototype pallet, Sunrez has failed to state a claim upon which relief may be granted."  Def.'s MTD at 4.  The parties divide their briefs into four issues which the Court addresses in the following order:  (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) regulatory taking; and (4) declaratory relief.  *See* Def.'s MTD at ii; Pl.'s Resp. at i.

### A.   The Government Argues Sunrez Fails to State a Claim for Breach of Contract

The government contends, "[w]hether or not Sunrez's research and development contract requires the Government to certify the prototype pallet . . . is a question of contractual interpretation, which is a matter of law, and thus may be addressed in resolving our motion to dismiss."  Def.'s Reply at 2 (first citing *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014); and then citing *Gilbert v. Dep't of Just.*, 334 F.3d 1065, 1071–72 (Fed. Cir. 2003)).  According to the government, "[t]o interpret Sunrez's research and development contract, the Court need go no further than the plain language of the contract terms[; t]here is no ambiguity."  Def.'s MTD at 10.  The government also argues its interpretation of the Contract "is consistent with the uniform phased process of the SBIR program."  Def.'s MTD at 10; *see* 15 U.S.C. § 638(e)(4).  The government asserts, "Sunrez simply does not, and cannot, establish that its SBIR research and development contract, whether phase two or 'phase II.5,' requires the Government to certify the prototype composite pallet."  Def.'s MTD at 2.

Plaintiff responds, "[p]ursuant to the Contract, upon delivery of six (6) prototype composite 463L pallets that successfully met or exceeded requirements of MIL-DTL-27443F, Sunrez would receive an airworthiness certification from ATTLA."  Pl.'s Resp. at 16 (citing Am. Compl. at 8–9).  Plaintiff also argues, "[t]his issue, as framed by the government, presents an issue for summary judgment, requiring Sunrez to meet a higher standard at the Motion to Dismiss phase than is required under Rule 12."  Pl.'s Resp. at 17 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Plaintiff responds to the government's SBIR phase argument, "[w]hile the Contract appears to be an SBIR Phase II contract, it was really an SBIR Phase II.5 contract," Pl.'s Resp. at 2, and "consistent with [the Contract's] Phase II.5 status, [it] task[s] Sunrez with developing six (6) prototype composite 463L pallets for testing and ATTLA certification," Am. Compl. at 6.

### B.   The Government Argues Sunrez Fails to State a Claim for Breach of the Duty of Good Faith and Fair Dealing

The government argues, "[n]one of the breaches alleged by Sunrez are, in fact, breaches of its SBIR phase two contract and, anyway, there are no allegations that the actions of the Air Force hindered Sunrez's work under the contract to develop and deliver a prototype composite pallet with a corresponding technical data package (TDP) and final report."  Def.'s MTD at 13. The government contends, "[w]hen Sunrez asserts that the Air Force's alleged actions interfered with the expected 'fruits of the contract' ([Pl.'s] Resp. at 20, 21, 23), it appears to be referring to the commercial application of the composite pallet in a Phase III contract."  Def.'s Reply at 12–13.  However, "because the Air Force never promised Sunrez a Phase III contract, this cannot be the basis for a breach of the duty of good faith and fair dealing of its Phase II (or Phase II.5) contract."  Def.'s Reply at 13.

Plaintiff responds, "[t]hough the implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the contract or create duties inconsistent with the contract's provisions, a party need not breach an express contractual duty to breach the implied duty of good faith and fair dealing."  Pl.'s Resp. at 20 (citing *CanPro Invs. Ltd. v. United States*, 131 Fed. Cl. 528, 532 (2017)).  Plaintiff further argues, "[a] party asserting a breach of the duty of good faith and fair dealing need only show an interference with reasonable expectations regarding the fruits of the contract."  Pl.'s Resp. at 20 (citing *CanPro Invs. Ltd.*, 131 Fed. Cl. at 532).  Plaintiff contends this inquiry is a "fact inquiry," Tr. at 120:20, and as such not one the Court can resolve at the motion to dismiss stage.  *See* Tr. at 120:15–20 ([PLAINTIFF]:  . . . . I don't think you'll find a case on breach of the duty of good faith and fair dealing that says that you can address reasonable intent of the parties or . . . reasonable intent of the parties based on some type of—anything other than a fact inquiry.").

## C.  The Government Argues Sunrez Fails to State a Claim for Regulatory Taking

To dismiss plaintiff's alternative takings argument, the government argues, "[t]akings claims, however, '"rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity" and therefore the "remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights."'"  Def.'s MTD at 21 (quoting *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016)).  The government contends Sunrez has no basis for the takings claim, because "[w]ith no contractual obligation to award a Phase III contract to Sunrez and submit the composite pallet for certification . . . the decision not to move forward with the composite pallet is squarely within the Government's discretion and made in the Government's proprietary capacity."  Def.'s Reply at 14 (citing *St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008)).

Plaintiff responds, "[t]o determine whether a regulation effects a Taking, courts look at (1) the character of the Government action; (2) the extent to which the regulation interferes with distinct, investment-backed expectations; and (3) the economic impact of the regulation."  Pl.'s Resp. at 30 (citing *Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999)).  Plaintiff argues, "the Government was not acting in a commercial capacity when it failed to select Sunrez's pallet for commercial application because the Government's action in this case goes

beyond commercial activity, as the decisions were beyond the scope of what was permissible under the circumstances." Pl.'s Resp. at 31–32.

### D. The Government Argues Plaintiff Fails to State a Claim for Declaratory Relief

In response to plaintiff's request for declaratory relief, the government argues, "[u]nder the Tucker Act, this Court has 'discretion to grant declaratory relief only in limited circumstances' during contract performance 'involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue.'" Def.'s MTD at 22 (first citing *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1271 (Fed. Cir. 1999); and then citing 28 U.S.C. § 1491(a)(2)). The government adds, "[t]he Court may 'consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests.'" Def.'s MTD at 22 (citing *Alliant*, 178 F.3d at 1271). The government argues "[n]one of these factors are satisfied in the present case." Def.'s MTD at 22.

Plaintiff responds, "[a] 'live dispute' is one in which there is a dispute regarding a party's obligation to perform." Pl.'s Resp. at 36 (citing *CW Gov't Travel Inc. v. United States*, 63 Fed. Cl. 369, 389 (2004); *Alliant*, 178 F.3d at 1270). Plaintiff contends, the live dispute is "that the Government has the obligation to perform by submitting Sunrez's pallets for ATTLA certification." Pl.'s Resp. at 36. Plaintiff also alleges, "its other causes of action—breach of contract, Takings, and breach of duty of good faith and fair dealing—do not adequately protect its interests, because even if the foregoing were granted in Sunrez's favor, Sunrez would still be without a pallet that is certified as airworthy, still destroying the economic viability of the pallet." Pl.'s Resp. at 37 (citing Am. Compl. at 27). Plaintiff also alleges the government's argument "that Sunrez's request for declaratory relief does not involve a question of contract interpretation" fails because "one party interprets the Contract to require certain performance (that the Government submit the pallet for certification upon the pallet meeting certain specifications) and the other party opposes that interpretation." Pl.'s Resp. at 37–38.

## III. Applicable Law

"A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327 (Fed. Cir. 2006) (quoting *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To establish a breach of contract claim, plaintiff must show a valid contract between parties, an obligation or duty arising from the contract, breach of that duty, and damages caused by that breach. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Contract interpretation is a matter of law and may be addressed by the Court in resolving a motion to dismiss. *Bell/Heery*, 739 F.3d at 1330 (citing *Cal. Edison v. United States*,

58 Fed. Cl. 313, 321 (2003)).  When interpreting a contract, unambiguous terms must be given their plain and ordinary meaning.  *Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1373 (Fed. Cir. 2001) (citing *Alaska Lumber & Pulp Co., Inc. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).

The implied duty of good faith and fair dealing is inherent in every contract and may be called the implied duty not to hinder and the implied duty to cooperate.  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 827–28 (Fed. Cir. 2010) (citing Restatement (Second) of Contracts § 205.  This duty essentially "requires a party to not interfere with another party's rights under the contract."  *Id.* at 828 (citing Restatement (Second) of Contracts § 205 at cmt. d).  A party's failure to fulfil the implied duty of good faith and fair dealing constitutes breach of contract.  *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (citing Restatement (Second) of Contracts § 235).

"To state a claim for a taking under the Fifth Amendment, a plaintiff must identify a legally cognizable property interest."  *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384–85 (Fed. Cir. 2019) (citing *Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005)).  "[E]xisting rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking."  *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citation and quotation marks omitted).

"The discretion to grant declaratory relief only in limited circumstances allows the court . . . to restrict the occasions for intervention during contract performance to those involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue."  *Alliant*, 178 F.3d at 1271.

## IV.  Analysis of the Government's Argument Plaintiff Fails to State a Claim for Breach of Contract

### A.  Whether the Contract Obligates the Government to Submit Plaintiff's Pallets for Certification

The government argues, "[w]hether or not Sunrez's research and development contract requires the Government to certify the prototype pallet . . . is a question of contractual interpretation, which is a matter of law, and thus may be addressed in resolving our motion to dismiss."  Def.'s Reply at 2 (citing *Bell/Heery*, 739 F.3d at 1330); *see also Gilbert*, 334 F.3d at 1071–72 ("[T]he determination of whether non-compliance with the terms of a contract is material, so as to constitute a breach, is a mixed question of fact and law.  What was required by way of contract performance turns on contract interpretation, which is an issue of law.").  The government asserts at the motion to dismiss stage "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Def.'s Reply at 2 (citing *Iqbal*, 556 U.S. at 678).  The government contends, "[b]ecause the SBIR phase two contract does not require the Government to certify the pallet developed under the contract, Sunrez's breach of contract claim fails as a matter of law."  Def.'s MTD at 13.

The government asserts the parties' contractual bargain is "pinpointed on page 2 of the cont[r]act:  the Government agreed to pay Sunrez $1,488,250.56 to develop and deliver a prototype composite pallet system in accordance with (IAW) the attached work plan." *Id.* at 7 (citing Contract at 2).  According to the government, the Work Plan "contains the objective; background; requirements and specifications; work task plan; schedule; and deliverables for Sunrez's development and delivery of the prototype composite pallet." *Id.* (citing Work Plan at 1–11).  The government contends the first section of the Work Plan, which details the objective of the Contract, "directly contradicts Sunrez's assertion that the contract requires the Government to certify the composite pallet for airworthiness:  'This [effort] will culminate in the delivery of six complete 463L pallets for *post* Phase II environmental/airworthiness certification.'" *Id.* (quoting Work Plan at 1).  The government also explains "[t]he background section of the work plan states that '[b]y the end of this effort, the contractor will achieve a [Technology Readiness Level (TRL) 6] by providing a fully functional composite pallet *ready* for full environmental and airworthiness qualification.'" *Id.*  The government urges, "[r]equiring that contractor provide prototypes ready for airworthiness qualification, should the Government decide to move forward with that design, is not a promise to contractor that the Government will certify the prototypes as such." *Id.* at 7–8.

The government states, "Sunrez asserts that one sentence in [the Requirements and Specification Section] creates an obligation on the Government to certify Sunrez's prototype pallet:  'Airworthiness Certification and Air Transportability Requirements will be met through compliance to MIL-DTL-27443F.'" Def.'s MTD at 8 (citing Am. Compl. at 8–9 n.4).  The government argues this provision is only a specification for the pallet, "requir[ing] Sunrez to construct pallets to comply with the specifications set forth in MIL-DTL-27443F." *Id.*  To support this argument, the government notes it is surrounded by other specifications, for example the pallets shall be constructed of "fungus resistant" materials.  *See id.* at 8–9 (citing Work Plan at 2).  "In this context, there can be no doubt that the provision that 'Airworthiness Certification and Air Transportability Requirements will be met through compliance to MIL-DTL-27443F,' does not, as Sunrez asserts, create a requirement for the Government." *Id.* at 9 (quoting Work Plan at 2).

The government also explains, "[t]he work task plan section 'breaks out the tasks to be performed during this 18-24 month effort,' including 'full scale testing,' but does not break out a task for the Government to certify the composite pallet for airworthiness." *Id.* (citing Work Plan at 2–6).  The government similarly argues neither the Schedule nor the Deliverables Sections create a requirement for the government to certify the pallet.  *See id.* at 9–10 (citing Work Plan at 6–9).  The government states "[o]ne of the milestones is 'Pallet build for Certification Testing'" but notes while this section identifies a "pallet build" milestone, it does not provide a "certification testing for airworthiness" milestone.  Def.'s MTD at 9 (citing Work Plan at 6–7).  Regarding the Deliverables Section, the government notes the "Contractor will provide delivery of 6 full scale complete assemblies of the new composite 463L pallet for certification testing to Robins Air Force Base," but "again while this section requires Sunrez to deliver the pallet, it does not identify certification of the pallet as a deliverable required from the Government." *Id.* at 9–10 (citing Work Plan at 7–9).  The government also states, "the deliverables section provides that '[t]hese pallets shall be delivered to support independent Government testing to 463L requirements at the end of Phase II prior to developing low rate production and process

transportability as part of Phase III.'" *Id.* at 10 (quoting Work Plan at 7).  The government contends "[t]his [section] indicates that while the contractor must deliver prototypes of a quality ready for airworthiness certification, should the Government choose to move forward with that design, the Government intends to conduct independent testing before making that choice." *Id.* at 9–10.

Plaintiff responds, "accepting Sunrez's alleged facts as true, Sunrez's breach of contract claim is plausible on its face."  Pl.'s Resp. at 16.  Plaintiff argues, "[p]ursuant to the Contract, upon the delivery of six (6) prototype composite 463L pallets that successfully met or exceeded the requirements of MIL-DTL-27443F, the Government would submit Sunrez's pallets for an airworthiness certification from the ATTLA." *Id.* at 5 (citing Am. Compl. at 8–9).  Plaintiff contends the government's duty to submit the pallets for ATTLA certification "is evidenced by Section 5.0 of the Work Plan, which specifically provides that one (1) of the milestones for the Contract was 'Pallet build for Certification Testing.'" *Id.* at 5 (citing Work Plan at 6).  Plaintiff continues, "[s]imilarly, the Deliverables section of the Work Plan evidences this fact via the following statement:  'Contractor will provide delivery of 6 full scale complete assemblies of the new composite 463L pallet for certification testing to Robins Air Force Base.'" *Id.*  Plaintiff further argues, "meeting MIL-DTL-27443F meant that Sunrez's pallets would receive ATTLA certification," *id.*, by quoting Work Plan Section 3.0:  "Airworthiness Certification and Air Transportability Requirements will be met through compliance to MIL-DTL-27443F," Work Plan at 2.  Plaintiff also states, "ATTLA specifically acknowledged and accepted its duty to certify the pallet at the Technical Interchange Meeting on August 27, 2014."  Pl.'s Resp. at 16 (citing Am. Compl. at 8–9).

Plaintiff alternatively argues, "[t]h[e] issue, as framed by the Government, presents an issue for summary judgment, requiring Sunrez to meet a higher standard at the Motion to Dismiss phase than is required under Rule 12." *Id.* at 17 (citing *Iqbal*, 556 U.S. at 678).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true 'to state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A complaint is "plausible on its face" only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although the complaint need not articulate "detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  In ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal citations and quotations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  Contract interpretation is an issue of law and so may be addressed by the Court in resolving a motion to dismiss. *Bell/Henry*, 739 F.3d at 1330; *see*

*also Gilbert*, 334 F.3d at 1071–72 ("What was required by way of contract performance turns on contract interpretation, which is an issue of law."). As the Court considers plaintiff's claim for breach of contract at the RCFC 12(b)(6) motion to dismiss stage, the Court must accept as true Sunrez's factual allegations and determine whether these facts support a "facially plausible" breach of contract claim. *See Iqbal*, 556 U.S. at 678.

When interpreting a contract, a court should start with the plain language of the contract, *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citations omitted), and unambiguous contract terms must be given their plain and ordinary meaning, *Landmark Land Co., Inc.*, 256 F.3d at 1373 (citation omitted); *see also Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369 at 1373 (citing *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1469 (Fed. Cir. 1998)) ("When the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls."). A contract is interpreted "as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (quoting *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)).

Under an express contractual duty analysis, the Court must determine whether plaintiff adequately alleges the government has "an obligation or duty arising out of the contract," *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959, to "submit Sunrez's pallets for ATTLA certification," Pl.'s Resp. at 17 (citing Am. Compl. at 15).

The Contract provides the Schedule is precedential by incorporating FAR 52.215-8.[1] *See* Contract at 9; Pl.'s Resp. at 24 ("the Work Plan takes precedence over all else"); Tr. at 31:25–32:1 ("THE COURT: . . . . So the work plan comes first. [GOVERNMENT]: Yes."). The first item in the Contract's Schedule provides the general bargain the government urges—Sunrez must develop and deliver six pallets for which the government must pay nearly $1.5 million—by stating Sunrez is to "Develop and Deliver prototype composite 463L pallet system [in accordance with the] work plan dated 06 March 2014." Contract at 2. The Schedule refers to the Work Plan for the parties' specific contractual duties by providing the pallets should be developed and delivered "[in accordance with the] work plan." *Id.*

Section 1.0 of the Work Plan gives the objective of the Contract as follows:

---

[1] The Contract incorporates by reference FAR 52.215-8 "Order of Precedence –Uniform Contract Format." *See* Contract at 9. FAR 52.215-8 provides:

> Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order:
>       (a)  The Schedule (excluding the specifications)
>       (b)  Representations and other instructions
>       (c)  Contract clauses
>       (d)  Other documents, exhibits, and attachments
>       (e)  The specifications

48 C.F.R. § 52.215-8.

> The objective of this effort is to use proven composite technologies to develop a new composite 463L pallet design to be used as a replacement for the current system. The objective will be reached by taking these new technologies through subscale testing followed by developing a number of complete pallets for full scale simulation testing. This will culminate in the delivery of six complete 463L pallets for post Phase II environmental/airworthiness certification.

Work Plan at 1. As this Contract "will culminate in the delivery of six complete 463L pallets," the highest and final objective of the Contract is Sunrez's delivery of six pallets to the government. *Id.* The government could only submit pallets for certification after receiving them, so according to the Objective Section, airworthiness certification would need to occur after this Contract "culminate[s]." *Id.* The Objective provision also states the pallets are delivered "for post Phase II environmental/airworthiness certification." *Id.* This provision shows Sunrez delivers the pallets to the government for a purpose, which is "for post Phase II environmental/airworthiness certification," but the plain language of this provision does not obligate the government to submit the pallets for ATTLA certification—especially as this phrase follows "[t]his will culminate in the delivery of six complete 463L pallets." *See id.* "Environmental/airworthiness certification" also follows "post Phase II," or in other words, after this "Phase II" Contract. Work Plan at 1. The plain language of Section 1.0 does not support plaintiff's argument the Contract obligates the government to submit the pallets for certification—rather the Contract's Objective Section shows certification would occur "post Phase II" or after this Contract "culminate[s]." *Id.*; *see McAbee Constr. Inc.*, 97 F.3d at 1435; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

Section 2.0 "Background" provides "[b]y the end of this effort, the contractor will achieve a [Technology Readiness Level ('TRL')] 6 by providing a fully functional composite pallet ready for full environmental and airworthiness qualification." Work Plan at 1. Plaintiff contends as, "[b]y the end of this effort," the pallets must be "ready for full environmental and airworthiness qualification," the government must perform such testing. *Id.*; *see* Am. Compl. at 3. This conclusion, however, does not follow from the plain meaning of this provision. *See McAbee Constr. Inc.*, 97 F.3d at 1435. Rather than providing a clear duty for the government to submit the pallets for certification testing, the Contract merely states "[b]y the end of this effort, the Contractor will . . . provid[e] a fully functional composite pallet *ready for* full environmental and airworthiness qualification." Work Plan at 1 (emphasis added). Requiring the pallets to be "ready for full environmental and airworthiness qualification" does not expressly obligate the government to submit the pallets for certification. *Id.* Rather, the opposite is likely correct, that the effort according to this Contract will "end" with a pallet "ready for," but before, certification testing. *Id.* This provision also provides "the Contractor will" so any duty flowing from this provision would obligate the Contractor, Sunrez. *Id.* The plain language of Section 2.0 does not support plaintiff's argument the government must submit the pallets for certification. *Id.*; *see McAbee Constr. Inc.*, 97 F.3d at 1435; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

Section "3.0 Scope – Requirements and Specifications" provides "[t]he scope of this Phase II effort includes the following work to be completed." Work Plan at 2 (emphasis omitted). Sunrez focuses on one sentence in this section, "Airworthiness Certification and Air Transportability Requirements will be met through compliance to MIL-DTL-27443F." Am.

Compl. at 9 n.5; Work Plan at 2.  As the government notes, however, this section provides "Requirements and Specifications" for the pallets, such as "the pallet shall lock into all 463L compatible rail systems," and "the materials shall be fungus resistant."  Work Plan at 2.  Sunrez designed the pallets and chose materials for the pallet construction, so these terms require Sunrez's compliance—not the government's.  Sentences in the surrounding paragraphs begin with "[t]he contractor shall," which affirms these terms describe pallet specifications that Sunrez must satisfy, not the government.  Work Plan at 2.  Given this context, the phrase "Airworthiness Certification and Air Transportability Requirements will be met through compliance to MIL-DTL-27443F" informs Sunrez of the government's pallet standards, but the plain meaning of this provision does not support plaintiff's argument the government is obligated to submit the pallets for certification.  *See McAbee Constr. Inc.*, 97 F.3d at 1435; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

       Section 4.0 "Work Task Plan" provides "the tasks to be performed during this 18–24 month effort."  Work Plan at 2–6.  Although this section describes "[t]esting of the full scale 463L pallet," it lacks a task expressly obligating the government to submit the pallets for ATTLA certification.  *See* Work Plan at 2–6.  Sunrez also relies on this section to support its argument the government breached the Contract by continually and unreasonably raising the bar during performance.  Pl.'s Resp. at 17.  This argument critiques the government's structural testing, not certification, so plaintiff's argument shows this section addresses structural testing and not the "certification" Sunrez seeks.  Section 5.0 "Schedule" provides, "[t]he following milestones have been identified in the development of the Phase II 463L Pallet system."  One of the milestones is "Pallet build for Certification Testing."  Work Plan at 6.  This milestone suggests Sunrez build the pallets to the specifications required for certification and provide accompanying product development documentation.  *See* Work Plan at 6.  Although the section provides expressly for structural testing by stating "Full Scale Pre-Qual Test," this section lacks a clear milestone for the government to submit the pallets for certification testing.  *See* Work Plan at 6.  The tasks preceding and following this milestone also require Sunrez to deliver documentation to the government, not vice versa.  The plain meaning of Sections 4.0 and 5.0 thus do not support plaintiff's argument the government must submit the pallets for certification.  *See McAbee Constr. Inc.*, 97 F.3d at 1435; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

       Section 6.0 "Deliverables" provides "[t]hese pallets shall be delivered to support independent Government testing to 463L requirements at the end of Phase II prior to developing low rate production and process transportability as part of Phase III."  Work Plan at 7.  Relevantly, this provision uses "testing" to describe the government's action, but it lacks the term "certification."  *See id.*  This section also describes "testing to 463L requirements" whereas sections referring to the certification standard note "compliance to MIL-DTL-27443F, *see id.* at 2, so "testing to 463L" likely refers to structural testing, not certification, *see id.* at 7.  Although this section uses passive voice, "[t]hese pallets shall be delivered," it is Sunrez's duty to deliver the pallets so if this provision assigns a duty it likely applies to Sunrez.  *Id.*  The section further notes "independent Government testing" occurs "at the end of Phase II" so the government's structural testing is to be the "end" of this Phase II Contract.  Work Plan at 7.  This provision also notably distinguishes between deliverables under this Phase II effort and deliverables under a Phase III effort.  *See id.*  Section 6.0 states "Phase II work deliverables are listed below"

including Section 6.3 "Hardware," which states the "Contractor will provide delivery of 6 full scale complete assemblies of the new composite 463L pallet for certification testing to Robins Air Force Base." *Id.* at 9. Section 6.3 starts with "Contractor will provide delivery" so this section clarifies *Sunrez's obligation* to not only deliver six pallets, but "[six] full scale complete assemblies of the new composite 463L pallet" including "[h]ardware." *Id.* The plain meaning of this section provides Sunrez's duty to deliver pallets designed to a certain specification such that the pallets are ready for certification testing but this section does not obligate the government to submit the pallets for certification testing. *See McAbee Constr. Inc.*, 97 F.3d at 1435; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

Sunrez does not contend the Contract terms are ambiguous in its amended complaint, nor in its response to the government's motion to dismiss, however, plaintiff's counsel suggested this at oral argument. *See* Tr. at 62:15–17 ("[PLAINTIFF]: . . . I've read a lot of contracts, Your Honor. I don't think this is unambiguous."). Plaintiff argues some provisions are "ambiguous if you read the other provisions in context with it." Tr. at 63:4–5. "When a contract is susceptible to more than one reasonable interpretation, it is ambiguous." *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) (citing *Jowette, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000)). "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a zone of reasonableness." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). Although plaintiff baldly asserts the Contract is ambiguous, plaintiff attempts to read language into the Contract, language the Contract as written lacks, and as such plaintiff does not show the Contract is susceptible to more than one reasonable interpretation. *HPI/GSA 3C, LLC*, 364 F.3d at 1334; *see also Night Vision Corp. v. United States*, 469 F.3d 1369, 1374 (Fed. Cir. 2006) (finding "[w]hatever may be the policy favoring small businesses in the present situation, there is simply no valid basis for reading such a requirement into the contract.").

Although the Contract lacks any individual term obligating the government to submit Sunrez's pallets for ATTLA certification, the Court "must interpret [the Contract] as a whole and in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *United Int'l Investigative Servs.*, 109 F.3d at 737 (citation omitted) (internal quotation marks omitted). To test the government's contractual obligations considering the contract "as a whole," the Court asked the government whether it could do anything with the pallets after receiving them and the government responded, "that's completely within the discretion of the Air Force under this contract." Tr. at 82:11–24. When the Court asked plaintiff what specific contractual provision the government would violate if it simply accepted the pallets, paid plaintiff, and then shelved the pallets, plaintiff responded, "[w]ell, you know, I think that's completely a hypothetical, but . . . I don't really know how to address that in this context, Your Honor." Tr. at 84:6–16. This discussion shows when considering the Contract as a whole, the government lacks any obligation regarding what it can and cannot do with the pallets it purchased for research and development purposes. *See Night Vision*, 469 F.3d at 1374 ("Whatever may be the policy favoring small businesses in the present situation, there is simply no valid basis for reading such a requirement into the contract."). To interpret a provision, such as "Pallet build for Certification Testing," as obligating the government to perform such testing would therefore impermissibly conflict with the Contract as a whole and specifically with the

Contract's Objective which states, "[t]his [Contract] will culminate in the delivery of six complete 463L pallets for post Phase II environmental/airworthiness certification."  Work Plan at 1.

The Court thus finds Sunrez's allegation the government breached the Contract by not submitting the pallets for ATTLA certification testing is not "plausible on its face" as Sunrez fails to adequately plead content allowing the Court to reasonably infer the government has an express contractual duty to submit the pallets for ATTLA certification.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Night Vision*, 469 F.3d at 1373; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959; *McAbee Constr. Inc.*, 97 F.3d at 1435.

## 1. Whether the Contract Provides Other Express Duties for the Government

Although Sunrez only pleads the government had an express duty to submit Sunrez's pallets for certification,[2] Sunrez implies three other express duties when it describes the government's "breaches":

(Breaches).  The Government breached its contracts with Sunrez by (a) attempting to coerce Sunrez into giving up its SBIR data rights by conditioning it upon a Phase III award, (b) continually and unreasonably raising the bar during performance, (c) refusing to meaningfully communicate with Sunrez through the course of performance of the Contract on issues material to the contract.  [Am. Compl. at 15].

Pl.'s Resp. at 17.  If plaintiff alleges the first three breaches were breaches of contract, plaintiff must show "an obligation or duty arising out of the contract."  *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

Regarding the first alleged breach, (a), at oral argument plaintiff alleged the government's duty regarding data rights is found in "DFARS 252.227-7018."[3]  Tr. at 38:24–39:1.  This provision provides the government's "[r]ights in noncommercial technical data and computer software" under the Small Business Innovation Research Program.  *See* 48 C.F.R. § 252.227-7018 (2014).  The provision grants certain rights to the government regarding the use

---

[2] Under the heading "Breach of Contract" Sunrez in its amended complaint only states "the government was obligated to submit Sunrez's composite 463L pallet design to ATTLA for worthiness certification" and "[t]he USAF's refusal to submit Sunrez's composite 463L pallet design to the ATTLA for airworthiness certification constitutes a material breach of the Contract."  Am. Compl. at 18–19; *accord* Def.'s MTD at 7 (arguing it is not contractually bound to "certify the prototype 463L pallet"); *accord* Pl.'s Resp. at 16–17 (discussing "duties" plaintiff alleges only the government's duty to submit pallets for certification); *accord* Pl.'s Resp. at 17 (discussing "damages" from the government's breach of contract, plaintiff only argues "the Government's refusal to submit the composite pallet design for ATTLA certification as required . . . . resulted in losses and damages to Sunrez.").

[3] This provision was "added by full text" in Amendment No. P00006 on 18 August 2017.  *See* 18 August 2017 Modification.  Prior to this modification, the Work Plan read, "[a]ll engineering and product definition data created using Government funding as a result of this contract shall be considered a part of the TDP and shall be delivered to the Government with unlimited rights."  Work Plan at 4.  As the government notes, "[t]he Air Force's alleged requests for a TDP with unlimited rights prior to this modification would have been consistent with the terms of the contract at that time."  Def.'s Reply at 8; *see* Work Plan at 4; 18 August 2017 Modification.

and distribution of data and reserves other rights for the Contractor.  *See id.*  Although the provision prohibits the government from "us[ing] or distribut[ing] technical data in a manner inconsistent with the ownership rights listed therein," it does not expressly prohibit the government from requesting rights "upon a Phase III award."  Flynt Letter at 1; *see* 48 C.F.R. § 252.227-7018 (2014).

Regarding the second alleged breach, (b), plaintiff states the government's duty to not raise the bar during performance is found in "[t]he testing requirements . . . at Task 6."  Tr. at 39:22–40:8; Tr. at 40:13–15 ("THE COURT:  So what specific provision under the contract was not adhered to?  [PLAINTIFF]:  Task 6.").  Task 6 of the Work Plan provides "[t]he tasks to be executed" include "full scale testing."  Work Plan at 6.  These tasks, however, are generic and lack specific duties for the government.  *See* Work Plan at 6 ("Develop[] full scale test plan . . . . Perform Full Scale Testing . . . . Document results of Full Scale testing.").  Task 6 further implies the directives are Sunrez's duties to the government, not the government's duties to Sunrez.  *See id.* ("Test validation results shall be communicated *to the Government* Contract Technical Representative.") (emphasis added).  Also, as the government notes, Section 6.0 "Deliverables" provides "[t]hese pallets shall be delivered to support *independent Government testing* to 463L requirements at the end of Phase II prior to developing low rate production and process transportability as part of Phase III."  *Id.* at 7.  Section 6.0 describes the government's part of the testing as "independent," suggesting the government has discretion to test the pallets according to its own procedures.  *See id.*  When discussing plaintiff's allegation regarding "extra contractual testing," plaintiff admits the Contract does not preclude the government from performing "extra" testing.  *See* Tr. at 58:2–10 ("THE COURT:  Well, so, is there something in the contract that says that the Government cannot do [extra] testing after receiving the prototype pallets? . . . .  [PLAINTIFF]:  I think the answer to that is, no, there's nothing prohibiting them from doing that, Your Honor."); Tr. at 58:18–19 ("[PLAINTIFF]:  [T]he Government is certainly not prohibited from doing its own testing.").

Regarding the third alleged breach, (c), at oral argument plaintiff referred generally to pages 4 and 5 of the Work Plan for the government's duty to meaningfully communicate with Sunrez.  When the Court asked plaintiff's counsel to read a duty the government owed, plaintiff responded "I don't think Sunrez was supposed to have these meetings [Section 6.2 Briefings/Reviews & Test Support, Work Plan at 8] by itself."  Tr. at 43:16–20.  When the Court asked "if the Plaintiff wanted to have a meeting, [did] the Government owe[] Plaintiff a meeting," plaintiff's counsel responded "[w]ell if the Government requested a meeting, the Government certainly had an obligation to participate at it."  Tr. at 44:4–10.  Plaintiff's counsel agreed the Contract does not obligate the government to attend any meeting Sunrez requests.  Tr. at 44:23–45:5 ("THE COURT:  . . . but [Section 6.2] in the contract doesn't say Plaintiff can demand a meeting with the Government and the Government needs to show up and be there.  [PLAINTIFF]:  No, Your Honor.").  Plaintiff would not concede this is just an issue of good faith and fair dealing, yet plaintiff could not identify a specific provision obligating the government in the manner plaintiff suggests.  *See* Tr. at 45:8–17 ("THE COURT:  . . . . Is it just generally that reading all . . . 12 pages of the work plan . . . just generally requires the Government to always be responsive?  [PLAINTIFF]:  No, Your Honor, but they can't act in bad faith . . . . THE COURT:  . . . .  Is this just an issue of good faith and fair dealing?  [PLAINTIFF]:  I don't think I would concede that.").

Regarding all three of these alleged breaches, plaintiff bears the burden of showing "an obligation or duty arising out of the contract," *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959; however, neither plaintiff's paragraph outlining the government's "duties," nor its paragraph outlining its "damages" mentions the government's express duties regarding these three breaches, *see* Pl.'s Resp. at 16–17. Further, during oral argument plaintiff was unable to identify specific provisions obligating the government to perform these three "duties." *See* Tr. at 37:20–38:7 ("[PLAINTIFF]:  the other breaches are . . . the Government just simply not being a good partner in the program.  THE COURT:  So that sounds like good faith and fair dealing. [PLAINTIFF]:  Well, it sounds like it, but it's also a contractual requirement."); Tr. at 58:8–12 (discussing the contractual provision relating to "extra contractual testing," Sunrez admits "that almost dovetails very nicely into the idea of the good faith and fair dealing").  The Court therefore does not find the Contract expressly obligates the government for these three "duties," *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959, rather these claims sound in the government's possible breaches of its implied duty of good faith and fair dealing as analyzed *infra* Section V.

## B.  Whether the SBIR Program Statute Obligates the Government to Submit Plaintiff's Pallet for Certification

The government argues Sunrez cannot establish its SBIR contract, "whether phase two or 'phase II.5,' requires the Government to certify the prototype composite pallet."  Def.'s MTD at 2.  The government argues, "that Sunrez's SBIR phase two contract culminates in the development of the prototype pallet, but defers the time and effort of certification, is consistent with the uniform phased process of the SBIR program.  *Id.* at 10 (citing 15 U.S.C. § 638(e)(4)). The government contends "[c]ertification is necessary to proceed to commercial application of the prototype pallet (the purpose of phase three), not for its research and development (the purpose of phase two)."  *Id.* at 11.  "It is thus logical that certification of the prototype would be paid for with non-SBIR funds *after*, and thus not part of, the research and development effort under Sunrez's phase two contract."  *Id.*  The government notes, "[c]ertification would have been in Phase III, if there had been one" and cites *Night Vision* for the proposition that there is "no duty on the government to award a Phase III contract to a concern that successfully completes a Phase II contract."  Def.'s Reply at 4 (citing *Night Vision*, 469 F.3d at 1374).  The government states Sunrez realizes this, which is why "Sunrez asserts for the first time in its amended complaint that '[w]hile the Contract appears to be an SBIR Phase II contract, it was really an SBIR Phase II.5 contract.'"  Def.'s MTD at 11 (citing Am. Compl. at 3, 9).

The government contends Sunrez's argument "fails for at least three reasons."  Def.'s MTD at 11.  First, the government argues, "Sunrez provides no support in fact or law for its suggestion that a 'phase II.5' contract would extend beyond phase two research and development into phase three commercial application efforts."  *Id.* at 12.  Second, "by the plain language of its terms, Sunrez's contract describes itself throughout as a phase two contract."  *Id.*  Third, "the plain language of Sunrez's contract" indicates "to the extent Sunrez's cont[r]act is a 'phase II.5' contract, such a contract is a continuation of phase two research and development rather than a partial jump to phase three commercial application, as Sunrez asserts."  *Id.*  In other words, the

government argues even if the Contract is a "phase II.5" contract, "it is still a type of an SBIR phase two contract." *Id.*

Plaintiff urges, "submitting Sunrez's pallets for [ATTLA] certification is consistent with the Contract's Phase II.5 status." Pl.'s Resp. at 6 (citing Am. Compl. at 8–9). "[T]hough the Contract has been referred to as a Phase II Contract, the Government admitted that the Contract was, in reality, a Phase II.5 Contract." *Id.* at 19 (citation omitted). Plaintiff supports this assertion by arguing, "by the end of the Contract: (1) Sunrez was to, and did, submit drawings that allowed for commercial production of its pallets without modification; and (2) the prototype pallets developed by Sunrez were to be submitted for Air Transportability Test Load Activity ('ATTLA') certification." Am. Compl. at 3 (citations omitted).

Congress created the SBIR program to ensure "that assistance be given to small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy." 15 U.S.C.A. § 638(a) (2021). "[T]he term 'Small Business Innovation Research Program' or 'SBIR' means a program under which a portion of a Federal agency's research and development effort is reserved for award to small business concerns through a uniform process having [three phases]." *Id.* § 638(e)(4). The "first phase [is] for determining . . . the scientific and technical merit and feasibility of ideas that appear to have commercial potential." *Id.* § 638(e)(4)(A). The "second phase . . . will further develop proposals which meet particular program needs, in which award shall be made based on the scientific and technical merit and feasibility of the proposals, as evidenced by the first phase, considering, among other things, the proposal's commercial potential." *Id.* § 638(e)(4)(B). "[W]here appropriate, a third phase" involves "commercial applications of SBIR-funded . . . research and development . . . or, for products or services intended for use by the Federal Government," or "the continuation of research or development that has been competitively selected using peer review or scientific review criteria." *Id.* § 638(e)(4)(C). Phase III funding is provided by either "non-SBIR Federal funding" or "non-Federal sources of capital." *Id.*

In *Night Vision*, the Federal Circuit affirmed a Court of Federal Claims RCFC 12(b)(6) dismissal of a small business contractor's breach of contract claim because the USAF was not contractually obligated to award a Phase III contract. *Night Vision*, 469 F.3d at 1374. The Federal Circuit found "neither [the Phase I nor the Phase II agreement] contained any explicit commitment that if Night Vision successfully completed the first two phases, it would receive a Phase III contract." *Id.* at 1373. Night Vision, however, contended "such a commitment was provided in [15 U.S.C. § 638] which . . . the Phase I and Phase II contracts should be deemed to incorporate." *Id.* The Federal Circuit found, "the statute that Night Vision invokes does not provide such a commitment," *id.*, and stated "[w]hatever may be the policy favoring small businesses in the present situation, there is simply no valid basis for reading such a requirement into the contract," *Id.* at 1374. The Federal Circuit concluded "if Night Vision believed it had a contractual commitment from the Air Force to give it a Phase III contract, one would expect it to submit a proposal for such contract—which it did not do." *Id.* at 1375.

Not only is the government not obligated to award a Phase III contract following a successful Phase II contract, but at oral argument, the Court asked the government whether "it

[would] be a violation of the SBIR provisions if there were two SBIR Phase II contracts essentially in competition with each other" to which the government responded, "No, Your Honor." Tr. at 86:11–14. The government continued "there's a phased process to the SBIR, and there's nothing that prohibits the Government from looking at different alternatives at the Phase II stage or at the Phase I stage or to move to Phase III with just two different designs if it chooses." Tr. at 86:21–87:1. In response at oral argument, plaintiff was unable to show how two simultaneous Phase II SBIR contracts would violate the Contract or the SBIR phased approach. *See* Tr. at 89:1–9 ("THE COURT: . . . you agree that there is no provision of the contract that would prohibit the Government from having the exact same contract for another pallet supplier. [PLAINTIFF]: The exact same? . . . I don't think the con—Your Honor, I think we've talked about this before. This contract would not be worded this way if it was a competition.").

Sunrez admits the Contract does not anywhere state it is a Phase II.5 contract. *See* Tr. at 13:7–9 ("[THE COURT]: Just to confirm, does the contract or the work plan state 2.5 anywhere? [PLAINTIFF]: Those words do not appear in it."). Sunrez also admits "[t]he Government is correct that there was no promise of a Phase III SBIR contract." Am. Compl. at 17; Pl.'s Resp. at 13. Although plaintiff argues Mr. Flynt's letter supports its argument the Contract is an SBIR Phase II.5 contract, Mr. Flynt in his letter states, the Contract "would culminate in the delivery of six complete 463L pallets for post-Phase II.5 environmental/airworthiness certification." Flynt Letter at 1. Mr. Flynt adds "[t]he Air Force did not have a contractual obligation to submit the pallets for Air Transportability Test Loading Activity (ATTLA)" certification under the effort," and "certification by ATTLA would not occur until Phase III of a SBIR contract." Flynt Letter at 1. This letter is consistent with the government's argument, "to the extent Sunrez's cont[r]act is a 'phase II.5" contract, such a contract is a continuation of phase two research and development rather than a partial jump to phase three commercial application, as Sunrez asserts." Def.'s MTD at 12.

Section 638(e)(4) only provides three SBIR contract phases which are Phase I, II, and III. Notably, the statute does not provide for "Phase II.5." *See* 15 U.S.C.A. § 638(e)(4). Plaintiff fails to offer legal support for its argument the government is obligated to certify its pallets because the Contract is a "Phase II.5" contract and the Court was unable to find any precedential caselaw holding the government is obligated to certify a product under a "Phase II.5" contract. The government describes Phase II.5 as "almost like a layperson's description of a sequential Phase II contract." Tr. at 103:9–10. The Contract might thus be described as a Phase II.5 contract because as the government noted at oral argument, "we've shown from the record, that this is Sunrez's second Phase II contract." Tr. at 103:10–12. Although the Contract is a "carry-on from a prior Phase II contract," the government argues, "it's still a Phase II contract." Tr. at 103:18–19. Plaintiff's logic about the SBIR phases is circular as plaintiff uses its Phase II.5 claim to support its argument the government has a duty to certify the pallets and plaintiff uses the government's duty to certify the pallets as support for the Contract's "Phase II.5 status." *Compare* Am. Compl. at 3 ("While the Contract appears to be an SBIR Phase II contract, it was really an SBIR Phase II.5 contract. . . . This is because by the end of the Contract . . . the prototype pallets developed by Sunrez were to be submitted for Air Transportability Test Load Activity ('ATTLA') certification."); *with* Am. Compl. at 9 ("submitting Sunrez's pallets for [ATTLA] certification is consistent with the Contract's Phase II.5 status."). This circular

reasoning reveals Sunrez's argument the USAF must certify Sunrez's pallets because the Contract is a Phase II.5 SBIR contract depends on Sunrez's argument the USAF is contractually bound to certify Sunrez's pallets—an argument the Court does not find persuasive.  *See supra* Section IV.A.

Plaintiff's arguments regarding the SBIR phases do not overcome the plain language of the Contract, especially given the relevant contract provisions are unambiguous.  *Hunt Const. Grp., Inc.*, 281 F.3d at 1373 (finding trade practice "irrelevant" as plaintiff did not claim the relevant provision contained a term of art, and thus the court held the "contract's unambiguous terms govern"); *see also Night Vision*, 469 F.3d 1369 (affirming RCFC 12(b)(6) dismissal of breach of contract claim because the contract did not provide for a follow-on phase III award and neither does the SBIR statutory regime).  Given the lack of support, the argument's circularity, and the Contract's unambiguous language, the Court finds the government does not have a duty to certify plaintiff's pallets, either under the Contract's plain language or the SBIR statute.  *Hunt Const. Grp., Inc.*, 281 F.3d at 1373; *Night Vision*, 469 F.3d at 1374; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959; *McAbee Constr. Inc.*, 97 F.3d at 1435.

## V.    Analysis of the Government's Argument Plaintiff Fails to State a Claim for Breach of the Duty of Good Faith and Fair Dealing

The government contends, the implied duty of good faith and fair dealing "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions," therefore, "any breach of that duty has to be connected, though it is not limited, to the bargain struck in the contract."  Def.'s MTD at 13 (first quoting *Precision Pine*, 596 F.3d at 831; and then quoting *Metcalf Constr. Co.*, 742 F.3d at 994).  The government argues, "[n]one of the breaches alleged by Sunrez are, in fact, breaches of its SBIR phase two contract and, anyway, there are no allegations that the actions of the Air Force hindered Sunrez's work under the contract to develop and deliver a prototype composite pallet with a corresponding technical data package (TDP) and final report."  Def.'s MTD at 13.  At oral argument, the government cited *E&I Global*, as a case where the Court of Federal Claims dismissed a good faith and fair dealing claim pursuant to RCFC 12(b)(6).  Tr. at 161:18–162:2 (citing *E&I Global Energy Servs., Inc. v. United States*, 144 Fed. Cl. 508 (2019)).

Regarding Sunrez's allegation the government breached the contract by changing the test parameters, the government states it "did not raise the bar on Sunrez's development and delivery of the prototype pallets under the Phase II contract."  Def.'s Reply at 5–6.  According to the government, "Sunrez does not identify any provisions in its Phase II contract that would require the Air Force to accept Su[nr]ez's testing, not do its own testing, and not have an internal analysis for deciding whether to move forward with the composite pallet into Phase III."  *Id.* at 6.  The government also argues, "Sunrez's specific allegations of the Government's lack of communication occur after Sunrez delivered the prototype pallets in June and July 2016."  *Id.*  The government concludes, "Sunrez, therefore, has not (and cannot) identify what contractual requirement the Air Force would have breached by its alleged lack of communication towards the end of the Phase II research and development contract."  *Id.* at 8.  Regarding Level III data, the government argues the contract provided "[a]ll engineering product definition data created using Government funding as a result of this contract shall be considered a part of the [Technical

Data Package (TDP)] and shall be delivered to the Government with unlimited rights." *Id.* (citing Def.'s MTD at 18).

In paragraph 55 of its complaint, Sunrez alleges "the Government engaged in numerous breaches designed to hinder Sunrez's performance of the Contract and impermissibly retaliate against Sunrez for refusing to give up its rights." Am. Compl. at 19.  Sunrez explains:

> These breaches included:  (a) repeatedly, improperly attempting to coerce and mislead Sunrez into giving up its SBIR data rights; (b) continually and unreasonably raising the bar during performance (*e.g.*, utilizing and conducting improper testing procedures); (c) refusing to meaningfully communicate with Sunrez throughout the course of performance of the Contract on issues material to the Contract; and (d) refusing to submit Sunrez's pallets for ATTLA certification.

Am. Compl. at 19.  Sunrez alleges "[t]hese breaches hindered Sunrez's ability to perform under the Contract and the foregoing breaches were done in an attempt to frustrate the purpose of the contract by (1) delaying performance of the pallet-testing requirements under the Contract; and (2) skewing and shelving the Phase II deliverables, despite their design and performance going beyond the minimum requirements."  Am. Compl. at 19–20.  Sunrez alleges "the Government's impermissible actions . . . borne out of retaliation and an attempt to improperly obtain intellectual property rights in Sunrez's pallets breached the duties of cooperation and not to hinder performance."  Am. Compl. at 20.  At oral argument plaintiff also stated "[w]e have alleged the facts to the extent that we can, but the Government has a whole bunch more facts that will illuminate the context."  Tr. at 145:3–5.  In response to the government's simplification of the contractual bargain as money for pallets, plaintiff responds, "it wasn't just the pallets; it was the TDP, too. . . . [and] that the TDP would be improved and it would be . . . revised to meet whatever efficiencies the Government thought that there were in the tested pallets."  Tr. at 157:20–25.  Plaintiff contends an implied duty of good faith and fair dealing inquiry is a "fact inquiry," Tr. at 120:20, so the Court cannot resolve this claim at the motion to dismiss stage before discovery, *see* Tr. at 120:15–20 ([PLAINTIFF]:  . . . . I don't think you'll find a case on breach of the duty of good faith and fair dealing that says that you can address reasonable intent of the parties or . . . reasonable intent of the parties based on some type of—anything other than a fact inquiry.").  At oral argument, plaintiff cited *ASI Constructors, Inc.* as a Court of Federal Claims case denying the government's motion to dismiss because "the claim relied on additional facts."  Tr. at 132:5–25 (citing *ASI Constructors, Inc. v. United States*, 129 Fed. Cl. 707 (2016)).

The implied duty of good faith and fair dealing is inherent in every contract, *Precision Pine*, 596 F.3d at 828 (citation omitted), and the government's failure to fulfil this duty would constitute breach of contract, *Metcalf Const. Co., Inc.*, 742 F.3d at 990 (citing Restatement (Second) of Contracts § 235).  This duty essentially "requires a party to not interfere with another party's rights under the contract."  *Precision Pine*, 596 F.3d at 828 (citing Restatement (Second) of Contracts § 205 at cmt. d).  The implied duty of good faith and fair dealing may also be called the implied duty not to hinder and the implied duty to cooperate.  *Precision Pine*, 596 F.3d at 827.  "The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United*

*States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (citations omitted); *see also* Restatement (Second) of Contracts § 205 cmt. d (stating potential breaches of the implied duty of good faith and fair dealing include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance").

In *Metcalf*, the government argued breach of the implied duty of good faith and fair dealing requires an express provision in the contract and the Federal Circuit explained "[t]hat goes too far:  a breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract." *Metcalf Const. Co., Inc.*, 742 F.3d at 994.  As Judge Sweeney states in *CanPro Investments, Ltd.*, any "argument that a party must base an allegation concerning breach of the implied covenant of good faith and fair dealing upon a specific 'substantive obligation within the [Contract]' . . . lacks merit." *CanPro Invs., Ltd. v. United States*, 131 Fed. Cl. 528, 532 (2017) (citation omitted).  "[W]hile the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" *Metcalf Const. Co.* 742 F.3d at 991 (quoting *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984) (Scalia, J.)).

The "[c]ases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch." *Precision Pine*, 596 F.3d at 829.  In *Precision Pine*, the Federal Circuit concluded "there was no breach of the government's implied duty of good faith and fair dealing because the Forest Service's actions during these formal consultations were (1) not 'specifically targeted,' and (2) did not reappropriate any 'benefit' guaranteed by the contracts, since the contracts contained no guarantee that the Precision Pine's performance would proceed uninterrupted." *Precision Pine*, 596 F.3d at 827.  Notably, the Federal Circuit was reviewing Judge Damich's ruling on a motion for summary judgment, not a motion to dismiss. *Precision Pine*, 596 F.3d at 820.  The Federal Circuit explains "the Government's duty [to cooperate] must be considered in light of the circumstances." *Milmark Servs., Inc. v. United States*, 731 F.2d 855, 859 (Fed. Cir. 1984) (affirming a Claims Court decision because the judge "carefully examined all the evidence presented and was unpersuaded, in view of the circumstances of the case, that [the government] had breached such duty").  A court's determination of whether a party's acts "destroy the reasonable expectations of the other party regarding the fruits of the contract," is necessarily intertwined with the contract and facts of a case. *See Centex Corp.*, 395 F.3d at 1304 (citations omitted).

Unlike the summary judgment motion in *Precision Pine*, this Court is ruling on a motion to dismiss and plaintiff here does allege the government failed to cooperate. *Compare* Tr. at 165:25–166:6 ("[PLAINTIFF]:  . . . what we're saying is that [the government] didn't cooperate at any point. . . . the ultimate certification question or whether it should be certified has behind it the type of testing that was done and the failure of the Government to cooperate up and through that testing as well."); *with Precision Pine*, 596 F.3d at 830 ("Nor is there any evidence of bad faith or failure to cooperate with Precision Pine.").  Also, as the Federal Circuit described in *Precision Pine*, Sunrez alleges a "bait-and-switch." Tr. at 131:18–22.  The Federal Circuit

- 22 -

describes a "bait-and-switch" as having two steps:  (1) "the government enters into a contract that awards a significant benefit in exchange for consideration"; and (2) "the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract."  *Precision Pine*, 596 F.3d at 829.  As the second part requires considering the government's actions after the contract is awarded, whether plaintiff was subject to a "bait-and-switch" is a fact-intensive inquiry.  As fact-dependent good faith and fair dealing cases are typically resolved at the summary judgment stage, *E&I Global* is an exception because, in that case, the contract specifically "foreclose[d] such an argument."  *E&I Global*, 14 Fed. Cl. at 514.  While the Contract forecloses Sunrez's argument the government must certify its pallets, the Contract does not foreclose the government's duty to cooperate.  *See supra* Section IV; *Precision Pine*, 596 F.3d at 820 n.1.

On a motion to dismiss for failure to state a claim, the Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co.*, 464 F.3d at 1327–28 (citation omitted).  The government admits "part of research and development is . . . communication," Tr. at 191:2–4, and Sunrez alleges facts indicating the government was uncommunicative, uncooperative, and "just simply not . . . a good partner in the program," Tr. at 37:20–38:3; *see also* Am. Compl. at 10 ("[T]he Government repeatedly rescheduled and cancelled meetings required under the Work Plan and, when it did not cancel the meetings, the Government was repeatedly unprepared for and/or otherwise refused to discuss items on the meeting agendas."); Am. Compl. at 10 ("[C]ommunication from WRAFB was problematic throughout the Contract."); Pl.'s Resp. at 29 ("If not dispositive on the issue of whether the Government acted improperly, at the very least, th[e] email from [CO] Renfroe confirms that the Government failed to communicate and failed to perform on the Contract as it should have.").  Plaintiff also alleges "Government delay[s] in testing required several contract modifications," Am. Compl. at 9, and if changes to the testing schedule required contract modifications, plaintiff's allegations regarding testing delays are likely "connected . . . to the bargain struck in the contract," *Metcalf Constr. Co.*, 742 F.3d at 994.

Sunrez takes the "bait-and-switch" argument one step further by alleging a government cabal effort to improperly obtain its data and give it to its competitors:

> All of the Government's actions and impermissible retaliation were borne out of the USAF's desire to improperly obtain the intellectual property rights to Sunrez's composite 463L pallet system and Sunrez's steadfast refusal to allow it to do so. Starting even prior to inception of the Contract, WRAFB personnel were insistent that Sunrez was to hand over all composite 463L pallet data for the Government to use with unlimited rights.  Despite the Government's acknowledgement at the Technical Interchange Meeting that the type of Level III data it was seeking was neither appropriate nor necessary for the Contract, it nevertheless continued to pressure Sunrez into relinquishing its data rights.  The Government even went so far as to have its Chief Engineer attempt to compel Sunrez into giving up its data rights in exchange for a hollow promise of a $4.5 million Phase III contract, a mere fraction of what was intended at the outset.

Am. Compl. at 20–21.  Plaintiff adds:

> The Government's continued failed attempts to impermissibly obtain Sunrez's intellectual property rights caused the Government to become increasingly hostile with each new, failed attempt.  This hostility ultimately culminated in the Government's completely ignoring Sunrez's dozens of attempts to reach it during the Contract's final weeks so as to hide from Sunrez the fact of its final retaliatory act and buy it enough time to manufacture its alleged reasons therefore.

Am. Compl. at 21.  Although proving a cabal may be difficult, these alleged acts could violate the duty of good faith and fair dealing.  *See Centex Corp.*, 395 F.3d at 1304 (citations omitted); Restatement (Second) of Contracts § 205 cmt. d; *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (citations omitted) (internal quotation marks omitted) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract."); *CanPro Invs., Ltd. v. United States*, 130 Fed. Cl. 320, 349 (2017) (quoting *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 770 (2005)) ("'Government actions that are unreasonable under the circumstances' are sufficient to constitute a breach of the implied duty not to hinder performance.").  The Court agrees with plaintiff's argument "[t]here are a plethora of disputed facts that make dismissal at this phase inappropriate."  Pl.'s Resp. at 15; *see also* Tr. at 154:19–23 ("[PLAINTIFF]: . . . we've alleged a whole plethora of facts about things that happened during the contract in Paragraphs 25 through 28 and then 36."); *ASI Constructors, Inc.*, 129 Fed. Cl. at 721 (denying the government's motion to dismiss because "[plaintiff] argues that its good faith and fair dealing claim relies upon additional facts").[4]

## VI.  Analysis of the Government's Argument Plaintiff Fails to State a Regulatory Taking Claim

To dismiss plaintiff's alternative takings argument, the government argues, "without the contract, [plaintiff] cannot identify a property interest that's at issue in a regulatory taking."  Tr. at 202:14–17.  "Plaintiff[] ha[sn't] pointed, other than the contract, to any property interest that's at stake in the regulatory takings and they haven't pointed to any regulation."  Tr. at 203:5–8.  The government also urges, "[t]akings claims . . . 'rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity' and therefore the 'remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.'"  Def.'s MTD at 20–21 (citing *Piszel*, 833 F.3d at 1376).  The government further argues, "[w]hen the

---

[4] Even if Sunrez proves a breach of the implied duty of good faith and fair dealing, proving damages may be difficult as Sunrez notes, "all of Sunrez's damages stem from the Government's breaches of the Contract . . . .  In particular, the Government's refusal to submit Sunrez's pallet for the ATTLA certification despite its contractual obligation to do so."  Pl.'s Resp. at 13 (citing Am. Compl. at 17).  In a breach of contract case, damages are typically awarded "sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed."  *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).  As the Court finds the government lacks an express duty to submit Sunrez's pallets for certification, Sunrez must show a benefit it "reasonably" expects according to the Contract.  *See Ind. Mich. Power Co.*, 422 F.3d at 1373; *Bell/Heery*, 739 F.3d at 1334–35 (citing *Centex Corp.*, 395 F.3d at 1304) ("Implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfering with another party's performances or from acting to destroy another party's reasonable expectations regarding the fruits of the contract.").

government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." Def.'s MTD at 21 (first citing *Piszel*, 833 F.3d at 1376; then citing *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1156 (Fed. Cir. 2014); and then citing *St. Christopher Assocs., L.P.*, 511 F.3d at 1385).

The government responds to plaintiff's *Florida Rock* argument, by stating, "*Florida Rock* is a regulatory takings case arising out of the denial of a permit under section 404 of the Clean Water Act." Def.'s Reply at 13 (citing *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1562 (Fed. Cir. 1994)). "It is thus inapposite to Sunrez's claim that the 'Government's unreasonable shelving' of an allegedly 'safer, stronger, and cheaper' pallet is a regulatory taking." Def.'s Reply at 13 (citing Am. Compl. at 25–26). The government concludes, Sunrez has no basis for the takings claim, because "[w]ith no contractual obligation to award a Phase III contract to Sunrez and submit the composite pallet for certification . . . the decision not to move forward with the composite pallet is squarely within the Government's discretion and made in the Government's proprietary capacity." Def.'s Reply at 14 (citing *St. Christopher Assocs., L.P.*, 511 F.3d at 1385).

Plaintiff responds, "[t]o determine whether a regulation effects a Taking, courts look at (1) the character of the Government action; (2) the extent to which the regulation interferes with distinct, investment-backed expectations; and (3) the economic impact of the regulation." Pl.'s Resp. at 30 (citing *Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999)). Sunrez alleges, "the Government's elevated testing requirements, and its extreme lack of alacrity and good faith, went far beyond normal regulation and destroyed all economic viability in the Sunrez pallets." Am. Compl. at 25. Plaintiff also argues, "the Government was not acting in a commercial capacity when it failed to select Sunrez's pallet for commercial application because the Government's action in this case goes beyond commercial activity, as the decisions were beyond the scope of what was permissible under the circumstances." Pl.'s Resp. at 31–32. Plaintiff cites *Florida Rock* arguing, "the Government must 'act fairly and reasonably, so that private parties can pursue their interests.'" Pl.'s Resp. at 32 (quoting *Fla. Rock Indus., Inc.*, 18 F.3d at 1571). Sunrez alleges several "facts, which support that the Government's actions went beyond what is reasonable, appropriate, or expected from a commercial actor." Pl.'s Resp. at 32–34.

"To state a claim for a taking under the Fifth Amendment, a plaintiff must identify a legally cognizable property interest." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384–85 (Fed. Cir. 2019). "The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Conti*, 291 F.3d at 1340 (citation omitted). "Instead, existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Id.* at 1340 (citation and quotation marks omitted). "To support a takings claim, a property interest must be more than a 'mere unilateral expectation or an abstract need.'" *Am. Bankers Ass'n*, 932 F.3d at 1385 (citation omitted). Contract rights are property rights which may be compensable under the Fifth Amendment. *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003); *see also Lynch v. United States*, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.").

"[W]hen the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." *Piszel*, 833 F.3d at 1376. "Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." *Hughes Commc'n Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (citations omitted); *see also A & D Auto Sales, Inc.*, 748 F.3d at 1156 (explaining remedies available under a breach of contract theory make takings liability redundant); *St. Christopher Assocs., L.P.*, 511 F.3d at 1385 ("In general, takings claims do not arise under a government contract because, as stated by the Court of Federal Claims, the government is acting in its proprietary rather than its sovereign capacity, and because remedies are provided by the contract.").

Furthermore, when a party alleges a breach of contract claim and a takings claim, the court first will consider whether a viable contract claim exists because "[i]t has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009); *see also City Line Joint Venture v. United States*, 503 F.3d 1319, 1323 (Fed. Cir. 2007) ("When a viable contract claim exists, we should not reach out to decide the takings issue. Clearly, there should not be double recovery, we should not commingle takings compensation and contract damages."). If, however, "the right at issue is not governed by the terms of the parties' contract, plaintiffs may pursue a takings action." *Allegre Villa v. United States*, 60 Fed. Cl. 11, 18 (2004) (citation omitted); *see also Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (noting a takings claim may provide plaintiff relief where contract claim is ineffective).

Plaintiff must allege a cognizable property interest to maintain a takings claim. *Am. Bankers Ass'n*, 932 F.3d at 1384–85. When the Court asked what property interest plaintiff is alleging, plaintiff responded, "[w]ell the property interest—you know, I don't agree with my colleague here that there's no property interest in not being allowed to compete fairly." Tr. at 199:17–22. Plaintiff states it has a property right in the ability "to compete at all in this sphere or this space or to even have a fair opportunity [to compete]." Tr. at 200:13–17. Plaintiff does not provide any support for its argument it has a property right in "being allowed to compete fairly," Tr. at 200:13–17, and this argument hinges on the government's alleged duty to submit the pallets for certification. The government states, "without the contract, [plaintiff] cannot identify a property interest that's at issue in a regulatory taking." Tr. at 202:14–17. The Court agrees with the government's statement, "Plaintiff[] ha[sn't] pointed, other than the contract, to any property interest that's at stake in the regulatory takings and they haven't pointed to any regulation." Tr. at 203:5–8. Plaintiff responded, "I don't agree with that," Tr. at 203:17–18, but then only stated "in the permitting process, there is always a property interest" and in the "anticipated sales of [pallets]," Tr. at 204:8–12. Yet again, however, plaintiff does not provide any support for these assertions.

What plaintiff asserts as a property right is like a "mere unilateral expectation or an abstract need," which is insufficient to support a takings claim. *Am. Bankers Ass'n*, 932 F.3d at

1385 (citation omitted).  In short, plaintiff does not allege a property interest other than its allegation the government must certify the pallets, which the Court does not find persuasive.  *See supra* Section IV.  Plaintiff's failure to allege a cognizable property interest is grounds to dismiss this claim for failure to state a claim upon which relief may be granted.  *See Conti*, 291 F.3d at 1339 (citations omitted) ("[I]f a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in *Penn Central*."); *United Communities, LLC v. United States*, 154 Fed. Cl. 676, 684–85 (2021) (granting the government's motion to dismiss and stating "[w]hile plaintiff may have intended to plead a takings claim based on a property interest other than its alleged expectations under the contract, that is not the claim that appears in the complaint."); *Stromness MPO, LLC v. United States*, 134 Fed. Cl. 219, 256 (2017) (citing *Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 438 (2009) ("If, however, the court determines that the property rights alleged to have been taken were solely created by the terms of the voluntary lease agreements between plaintiff and defendant, then the proper remedy, if any, lies in the contract.").  As plaintiff is not entitled according to the Contract to have the pallets submitted for certification, and plaintiff does not allege a property interest outside the Contract, the Court grants the government's motion to dismiss against plaintiff's claim for a regulatory taking.[5]  *See Conti*, 291 F.3d at 1339 (citations omitted); *United Communities*, 154 Fed. Cl. at 684–85 (granting the government's motion to dismiss and stating "[w]hile plaintiff may have intended to plead a takings claim based on a property interest other than its alleged expectations under the contract, that is not the claim that appears in the complaint."); *see also Night Vision*, 469 F.3d 1369 (affirming a Court of Federal Claims RCFC 12(b)(6) dismissal of a small business contractor's breach of contract claim because the USAF was not contractually obligated to award a Phase III contract).

## VII.   Analysis of the Government's Argument Plaintiff Fails to State a Claim for Declaratory Relief

The government states, "[u]nder the Tucker Act, this Court has 'discretion to grant declaratory relief only in limited circumstances' during contract performance 'involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue.'"  Def.'s MTD at 22 (first citing *Alliant*, 178 F.3d at 1271; and then citing 28 U.S.C. § 1491(a)(2)).  The government continues, "[t]he Court may 'consider the appropriateness of declaratory relief, including whether the claim involves a live dispute between the parties, whether a declaration will resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests.'"  *Id.* (citing *Alliant*, 178 F.3d at 1271).  The government argues "[n]one of these factors are satisfied in the present case."  *Id.* Against plaintiff's first claim of declaratory relief, the government argues, "[e]ven if Sunrez had stated a claim for declaratory relief . . . there is no such certification requirement in Sunrez's SBIR phase two contract," so Sunrez's claim fails as a matter of law.  *Id.*  Against plaintiff's second claim for declaratory relief, the government states, "[w]hile the Government agrees that

---

[5] In reaching this decision, the court does not hold a party cannot assert in the same complaint a breach of contract claim and a takings claim.  *See Stockton E. Water Dist.*, 583 F.3d at 1369 (stating "the fact that a cause of action was pled under a contract theory did not preclude a separate count for a cause of action based on a taking").  The Court's ruling is limited to finding plaintiff has failed to sufficiently plead a cognizable property interest.

the issue of what is required under the contract . . . is an issue of contract interpretation and thus question of law . . . the issue of whether Sunrez's composite pallet meets the contract requirements is . . . a question of fact." Def.'s Reply at 15 (citing *Gilbert*, 334 F.3d at 1072). The government also argues, "there is no 'live dispute' because Sunrez is no longer performing its research and development contract." Def.'s MTD at 22. The government further states, "Sunrez cannot show that its legal claim for breach of contract is inadequate to protect its interests." *Id.*

Plaintiff contends, "[a] 'live dispute' is one in which there is a dispute regarding a party's obligation to perform." Pl.'s Resp. at 36 (first citing *CW Gov't Travel*, 63 Fed. Cl. at 389; and then citing *Alliant*, 178 F.3d at 1270). Plaintiff contends, the live dispute is "that the Government has the obligation to perform by submitting Sunrez's pallets for ATTLA certification." *Id.* Plaintiff also alleges, "its other causes of action—breach of contract, Takings, and breach of duty of good faith and fair dealing—do not adequately protect its interests, because even if the foregoing were granted in Sunrez's favor, Sunrez would still be without a pallet that is certified as airworthy, still destroying the economic viability of the pallet." *Id.* at 37 (citing Am. Compl. at 27). Plaintiff also alleges the government's argument "that Sunrez's request for declaratory relief does not involve a question of contract interpretation" fails because "one party interprets the Contract to require certain performance (that the Government submit the pallet for certification upon the pallet meeting certain specifications) and the other party opposes that interpretation." *Id.* at 37–38. Plaintiff states, "[i]f this Court were to grant Sunrez's request for declaratory relief, this declaration would resolve the dispute—namely, that the Government's obligation to perform will be resolved." *Id.* at 37. Plaintiff notes this question "is not a question of fact, but rather, a question of contract interpretation." *Id.* at 38.

Congress amended the Tucker Act in 1992 to provide the Court of Federal Claims jurisdiction over some "nonmonetary disputes." 28 U.S.C.A. § 1491(a)(2) (2021). In *Alliant*, the Federal Circuit explained, "[t]he discretion to grant declaratory relief only in limited circumstances allows the court . . . to restrict the occasions for intervention during contract performance to those involving a fundamental question of contract interpretation or a special need for early resolution of a legal issue." *Alliant*, 178 F.3d at 1271. The Court "is free to consider the appropriateness of declaratory relief" and may consider whether "the claim involves a live dispute between the parties, whether a declaration would resolve that dispute, and whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Id.* Notably, the Federal Circuit states this Court has "discretion" when weighing a request for declaratory relief and the Court may exercise this discretion "in limited circumstances." *Id.*; *see Md. Enterprise, L.L.C. v. United States*, 91 Fed. Cl. 511, 530 (2010) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)) ("In *Wilton* the Court held that, 'consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close.'").

Plaintiff states "[a] 'live dispute' is one in which there is a dispute regarding a party's obligation to perform." Pl.'s Resp. at 36 (first citing *CW Gov't Travel*, 63 Fed. Cl. at 389; and then citing *Alliant*, 178 F.3d at 1270). When Sunrez "requests a declaration that its composite pallet met all of the Contract's deliverables and that the Government is required to properly

submit same for ATTLA certification," Am. Compl. at 26, the only obligation plaintiff asserts is the government's obligation to submit Sunrez's pallets for certification, *see* Pl.'s Resp. at 36 (citation omitted) ("[T]he Government has the obligation to perform by submitting Sunrez's pallets for ATTLA certification."); *see also* Am. Compl. at 26 ("pursuant to the plain language of the Contract, the Government was required to submit Sunrez's pallet for ATTLA certification."). Later in its response, Sunrez says the same thing another way: "[W]hether the Court should declare the . . . pallet meets all specifications is . . . a question of contract interpretation because one party interprets the Contract to require certain performance (that the Government submit the pallet for certification upon the pallet meeting certain specifications) and the other party opposes that interpretation." Pl.'s Resp. at 38. The Court finds the government does not have a duty to submit the pallets for certification and plaintiff does not plead the government has another "obligation to perform," so there is no live dispute between the parties. *See supra* Section IV; *see also CW Gov't Travel*, 63 Fed. Cl. at 389 ("The only possible 'live dispute' in this case concerns [plaintiff's] future obligation to perform."). Without a "live dispute between the parties" plaintiff's claim for declaratory relief fails. *See Alliant*, 178 F.3d at 1271.

Furthermore, similar to *Todd Construction, L.P. v. United States*, 88 Fed. Cl. 235 (2009), even if there is a "live dispute" between the parties, "[i]t is not clear . . . that a declaration of rights will resolve that dispute." *Todd Constr.*, 88 Fed. Cl. at 244. In *Todd Construction*, the court found "although [it] possesses jurisdiction to declare the rights of the parties, declaratory relief alone would be insufficient to provide the plaintiff with any of the relief it seeks." *Id.* The court continued "[d]efendant is correct that a mere declaration 'will not necessarily resolve the dispute' because it would neither cause the performance evaluation rating to be changed nor cause the evaluation to be removed from [the Construction Contractor Appraisal Support System]." *Id.* Sunrez requests this Court "declar[e] that its composite pallet met all of the Contract's deliverables and that the Government is required to properly submit same for ATTLA certification." Am. Compl. at 26. Even if the Court were to declare the pallet met the Contract's deliverables, the Contract does not obligate the government to submit the same for certification, *see supra* Section IV, and so "[i]t is not clear . . . that a declaration of rights will resolve [the parties] dispute," *Todd Constr.*, 88 Fed. Cl. at 244.

Regarding plaintiff's request the Court declare "the government is required to properly submit [its composite pallet] for ATTLA certification," the Court finds the government is not required to submit the pallet for certification, *see supra* Section IV, so the Court agrees with the government, "th[is] part [sh]ould go away," Tr. at 207:11–12. Sunrez does not assert another obligation, so Sunrez does not show "[its] claim involves a live dispute between the parties." *Alliant*, 178 F.3d at 1271. This Court therefore finds plaintiff has not shown this case is within the "limited circumstances" justifying declaratory relief. *See id.*; *Todd Constr.*, 88 Fed. Cl. at 244; *Md. Enterprise, L.L.C.*, 91 Fed. Cl. 511.[6] Given that a breach of contract claim remains, *see*

---

[6] Regarding the other factors for the Court to consider in assessing requests for declaratory relief, in *Alliant*, the Federal Circuit described "a special need to resolve the issue in a timely manner," and "whether the legal remedies available to the parties would be adequate to protect the parties' interests." *Alliant*, 178 F.3d at 1271. On timeliness, without a government obligation to submit the pallets for airworthiness certification, and without pleading any other obligation under the Contract, plaintiff does not show this issue is one with "a special need to resolve the issue in a timely manner." *Id.*; *see supra* Section IV; *see also Hamilton Securities Advisory Servs., Inc. v. United States*, 60 Fed. Cl. 144, 156 (2004) (citing *Alliant*, 178 F.3d at 1271) (finding no "special need for early resolution of a legal issue" because "performance under the [contract] ha[d] been completed and a trial [wa]s

*supra* Section V, the Court stays full consideration of the declaratory relief claim, however, it is likely any "declaratory relief would be meaningless."  *Todd Constr.*, 88 Fed. Cl. at 244; *see Alliant*, 178 F.3d at 1271.

## VIII.   Conclusion

For the foregoing reasons the Court **GRANTS-IN-PART, DENIES-IN-PART, and STAYS-IN-PART** the government's motion to dismiss pursuant to RCFC 12(b)(6).[7]  The Court grants the government's RCFC 12(b)(6) motion to dismiss as to plaintiff's claim for breach of contract, and regulatory taking.  The Court denies the government's RCFC 12(b)(6) motion to dismiss as to plaintiff's claim for breach of the implied duty of good faith and fair dealing.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

scheduled.").  On the legal remedies available, Sunrez's damages claim would likely be sufficient to protect its interests as Sunrez claims: "losses and damages . . . [including the] anticipated market value of Sunrez's pallet prior to the Government's breaches."  Am. Compl. at 24.

[7] The Court also accepts the government's MTD Reply filing despite its untimeliness, *see* ECF No. 21.