# In the United States Court of Federal Claims

No. 21-568

(Filed:  7 March 2025)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SUNREZ CORPORATION, | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Bryant S. Banes*, with whom were *Sean D. Forbes*, *Efosa J. Asemota*, and *Sarah P. Harris*, all of Neel Hooper & Banes, P.C., all of Houston, TX, for plaintiff.

*David M. Kerr*, Senior Trial Counsel, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Elizabeth M. Hosford*, Assistant Director, Department of Justice, Commercial Litigation Branch, Civil Division, of Washington, DC, *Isabelle P. Cutting*, Trial Attorney, *Maj. Erik T. Fuqua*, Acquisition Attorney, and *T Greer Aiken, Jr.*, Attorney Air Force, Civil Law/Acquisition and Fiscal Law and Litigation, of Robins Air Force Base, GA, for defendant.

## OPINION AND ORDER

Plaintiff Sunrez Corporation is a small business contractor with a history of innovative government research work.  In 2014, Sunrez entered a Small Business Innovative Research contract with the Air Force to design, develop, and build the best next-generation air-cargo pallets.  During Phase II of the SBIR contract, the "partnership" dissolved over data rights.  In 2022, the Court previously narrowed plaintiff's counts to one:  breach of the implied duty of good faith and fair dealing.  *See Sunrez Corp. v. United States*, 157 Fed. Cl. 640, 668 (2022). The parties proceeded through discovery and filed cross-motions for summary judgment on the final count.  For the following reasons, the Court grants the government's Motion for Summary Judgment and denies plaintiff's Cross-Motion for Summary Judgment.

---

[*] This Order was originally filed under seal on 3 March 2025 pursuant to the protective order, ECF No. 31, in this case.  The Court provided the parties an opportunity to review this Order for any proprietary, confidential, or other protected information, and submit proposed redactions by 6 March 2025 at 5:00 p.m. (ET).  As the parties confirmed they have no redactions, this Order is now reissued in its original form.

## I.    Factual History[1]

The Court begins by detailing the factual history surrounding the Air Force effort to re-design the current 463L legacy air-cargo pallets.  The Court then details plaintiff's contract with the government and its specific provision at issue.

### A.  The Air Force's Attempt to Obtain New Air-Cargo Pallets

Plaintiff Sunrez Corporation is a small business contractor with a history of entering into Small Business Innovative Research ("SBIR") contracts with the government.[2]  This case arises out of SBIR contract No. FA8501-14-C-0013 ("the Contract") between plaintiff and the United States Air Force ("USAF") awarded and entered into on 26 March 2014 to develop and deliver prototype, next-generation composite 463L pallets with a corresponding Draft Technical Data Package ("TDP") describing the prototype pallet.  *See* Pl.'s First Am. Compl. and Req. for Relief ("Am. Compl.") at 4, ECF No. 8; Gov't's Mot. for Summ. J ("Gov't's MSJ") at 1, ECF No. 69; Pl.'s Cross-Mot. for Summ. J. and Opp. to Gov't's MSJ ("Pl.'s CMSJ") at 7–8, ECF No. 74.  USAF uses 463L pallets, standardized air-cargo pallets, for loading and deploying up to 10,000 pounds of cargo.  *See* Am. Compl. at 3–4.  Under the Contract, USAF agreed to pay plaintiff $1,488,250.56 to develop and deliver six prototype composite 463L pallets and a corresponding TDP.  *See* Gov't and Pl. MSJ App'x ("App'x") at 1–66 ("Contract"), ECF Nos. 69-2, 75; *id.* at 1–3; Pl.'s CMSJ at 7–8.

USAF needed the new pallet designs because the current 463L pallet design ("the legacy pallet") experienced significant amounts of wear and tear resulting from heavy use in punishing environments.  *See* App'x at 20–30 ("Work Plan").  USAF also sought to increase pallet manufacturers as the legacy pallet was manufactured and repaired by only one manufacturer since 1963.  As a result, USAF sought "to develop as many more-durable, less-expensive, less-environmentally-damaging, next-generation [pallet] designs as possible."  Gov't's MSJ at 4.  In a concurrent, but separate effort, USAF contracted with the University of Dayton Research Institute ("UDRI") to perform a feasibility study on a different alternative to the legacy pallet.  *See* Gov't's Proposed Findings of Uncontroverted Fact ¶ 1 ("GFUF"), ECF No. 69-1.  UDRI recommended USAF pursue an all-aluminum pallet design.  *See* GFUF ¶¶ 25, 27.  USAF then awarded a Rapid Innovation Fund ("RIF") contract to URDI with instructions to "develop a next-generation all-aluminum pallet, construct prototypes, and deliver them with a corresponding [TDP] to the Air Force with unlimited rights."  Gov't's MSJ at 4 (citing GFUF ¶¶ 25, 27).  The RIF contract led to construction of "sixteen all-aluminum pallets . . . for inspection and testing."  *Id.* at 5 (citing GFUF ¶ 30).  After a verbal report confirmed all-aluminum pallets passed the structural testing, USAF contracted with UDRI to "build 500 pallets for Operation Test & Evaluation (field testing)."  *Id.* (citing GFUF ¶ 32).  USAF, however, did not move forward with plaintiff's composite pallets or grant plaintiff a Phase III SBIR contract because the composite

---

[1] All facts in this section are undisputed, unless stated otherwise.  *See* RCFC 56(a) (requiring a movant for summary judgment to demonstrate "there is no genuine dispute as to any material fact").  The Court draws all inferences "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

[2] A full history and background on SBIR contracts FA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 and FA8501-13-C-0042 between the parties leading to the Contract at issue is discussed in the Court's 20 January 2022 Order.  *See Sunrez Corp. v. United States*, 157 Fed. Cl. 640 (2022).

pallets did not pass the first article testing and USAF determined plaintiff's Draft TDP did not conform with the Contract.  *See* Pl. CMSJ at 5, 16, 24.   USAF therefore never completed testing of plaintiff's pallets and did not submit the pallets for Air Transportability Test Load Activity ("ATTLA") certification.  *Id.* at 1–9.

### B.  Plaintiff's SBIR Contract

The Contract provided a 24-month performance period from 26 March 2014 to 26 March 2016.  *See* Contract at 1–6.  Under the Contract's schedule, plaintiff was to develop and deliver prototype composite 463L pallet system in accordance with the 6 March 2024 Work Plan.  *See* Contract at 3.  The Work Plan contained provisions for plaintiff's "Advanced Composite 463L Pallet Development," including:  Section 1.0 Objective; Section 2.0 Background; Section 3.0 Scope; Section 4.0 Work Task Plan; Section 5.0 Schedule; Section 6.0 Deliverables; Section 7.0 General Information; and Section 8.0 Demonstrations.  *See* Work Plan.

The relevant provision of the Work Plan is Section 4.0 Work Task Plan.  *Id.* at 21–24. Task 4 of the Work Plan dictates the requirements for a TDP:

> A Draft Technical Data Package (TDP) sufficient to allow competitive re-procurement and spares procurement shall be initiated for the new design at the completion of the Phase II effort. . . .   [N]o maintenance data beyond basic component replacement procedures will be required.  Retention of compliance with the current 463L form-fit-function, along with retention of compliance with technical interfaces to ancillary items . . . should minimize or eliminate any requirements for technical data changes to these items technical data packages.  The contractor shall develop/produce/maintain and deliver a TDP that accurately depicts the final product. The TDP shall represent the approved, tested, and accepted configuration of the defined delivered item(s).  TDP data includes, but is not limited to, Computer Aided Design (CAD) data, CAD models, model based definition data sets, Gerber data and Master Bill of Materials (BOM). The TDP shall provide the necessary design, engineering, manufacturing, testing and quality assurance requirements information necessary to enable the procurement or manufacture of interchangeable item that duplicates the physical and performance characteristics of the original product without additional design engineering effort or recourse to the original design activity or any third party.  All engineering product definition data created using Government funding as a result of this contract shall be considered a part of the TDP and shall be delivered to the Government with unlimited rights.  The TDP shall be delivered in accordance with Air Force Product Data Specification drawing . . . .

Work Plan at 22–23.

### C.  Technical Data Packages

A technical data package describes the product or data produced under a contract and is "a paper version of what the [g]overnment has purchased."  *See* 19 Sept. 2024 Oral Arg. Tr.

("Tr.") at 5:12–6:2. While every SBIR contract requires a technical data package, the level of detail required depends on the particular contract. *See* Tr. at 6:20–7:3. A technical data package is therefore different for each product, and the progression of technical data packages will vary depending on government needs and the stage of development for a particular project. *See* Tr. at 8:5–22. The government obtains data rights to all technical data generated and included in a technical data package under an SBIR contract. *See* Gov't's MSJ at 3. An SBIR contractor, however, is not without data rights. If a contractor has previously developed technology, the government obtains only limited rights to that data if it is properly disclosed and marked as background technology. *See id.* Even with this protection for the contractor, the government always obtains data rights in "form, fit, and function data, and data necessary for operations, maintenance, installation, or training (other than detailed manufacturing or process data)." *Id.*

Although Task 4 requires "A Draft Technical Data Package (TDP) sufficient to allow competitive re-procurement and spares procurement shall be initiated for the new design at the completion of the Phase II effort," Work Plan at 22, plaintiff continually denied USAF's request for what it deemed a Level III TDP arguing the Contract is a product development contract, not a production contract, *see* Am. Compl. at 7. USAF later concluded the "Level III data it had been seeking from Sunrez was inappropriate," but "expressed its growing displeasure with Sunrez's use of the term 'proprietary' in the monthly reports to the [g]overnment." *Id.* As a result, USAF sent plaintiff a memorandum of understanding ("MOU") stating "[b]efore SBIR III effort can be awarded, the [D]raft TDP needs to be delivered and accepted by" USAF, *see* App'x at 881, which plaintiff refused to sign, *see* Am. Compl. at 9. Later, the parties modified the Contract to include an SBIR data rights clause to grant USAF limited rights in such SBIR technical data. *See* Gov't's MSJ at 19. Even with this data rights clause, plaintiff delivered a Draft TDP that did not accurately reflect the final product or include information on the pallet's core. *See id.* at 7–8; Pl.'s CMSJ at 1–4.

## II. Procedural History

On 18 September 2020, plaintiff submitted a certified claim to the Contracting Officer ("CO") for the Contract, seeking $132 million under the Contracts Disputes Act ("CDA"). *See* Am. Compl. at 1. On 19 November 2020, the CO denied plaintiff's entire claim in a Final Decision, which plaintiff appealed for de novo review in this Court. *See id.* at 2. On 2 April 2021, plaintiff filed an Amended Complaint alleging four causes of action, alleging: (1) USAF refused "to submit Sunrez's composite 463L pallet design to the ATTLA for airworthiness certification constitutes a material breach of the Contract," *id.* at 18; (2) USAF "engaged in numerous breaches designed to hinder Sunrez's performance of the Contract and impermissibly retaliate against Sunrez for refusing to give up its rights," *id.* at 19; (3) USAF's "regulatory taking of Sunrez's property without just compensation," *id.* at 25; and (4) plaintiff "requests a declaration that its composite pallet met all of the Contract's deliverables and that the Government is required to properly submit same for ATTLA certification," *id.* at 26. On 20 January 2022, the Court narrowed plaintiff's counts to only breach of the implied duty of good faith and fair dealing. *See Sunrez*, 157 Fed. Cl. at 668.

On 14 December 2023, the government filed a motion in limine to exclude plaintiff's expert reports and testimonies. *See* Gov't's Mot. in Limine at 1, ECF No. 60. Plaintiff

responded on 27 December 2023, ECF No. 61, and the government replied on 3 January 2024, ECF No. 62. On 22 February 2024, per the parties' agreement, the Court deferred-in-part and found as moot-in-part the government's Motion in Limine. *See* 22 Feb. 2024 Order at 2, ECF No. 65.

On 20 March 2024, the government filed a motion for summary judgment. *See* Gov't's MSJ. On 19 April 2024, plaintiff responded and filed a cross-motion for summary judgment. *See* Pl.'s CMSJ. In plaintiff's Cross-Motion for Summary Judgment, plaintiff included a motion to strike relating to two declarations included in the government's Motion for Summary Judgment Appendix. *See id.* at 29–31. On 3 May 2024, the government replied and responded to plaintiff's Cross-Motion. *See* Gov't's Reply in Supp. of MSJ and Resp. to Pl.'s CMSJ and Mot. to Strike ("Gov't's Reply"), ECF No. 76. On 17 May 2024, plaintiff replied. *See* Pl.'s Reply in Supp. of Pl. CMSJ and Mot. to Strike ("Pl.'s Reply"), ECF No. 80.

On 25 June 2024, the Court held a status conference to discuss plaintiff's Motion to Strike and scheduling oral argument. *See* 10 June 2024 Order, ECF No. 81. At the status conference, the parties agreed the Court may defer ruling on plaintiff's Motion to Strike and the government's Motion in Limine until after ruling on dispositive motions or trial. *See* 25 June 2024 Order at 1–2, ECF No. 85. The Court subsequently deferred ruling on plaintiff's Motion to Strike. *See id.* at 2. On 19 September 2024, the Court held oral argument regarding the dispositive motions. *See* 6 Aug. 2024 Order, ECF No. 86.

Following the oral argument, plaintiff filed a notice of supplemental authority on 3 October 2024. *See* Pl.'s Notice of Suppl. Auth. ("Pl.'s Suppl. Auth."), ECF No. 90. To allow full review of the new authorities offered by plaintiff, the Court ordered the government to respond. *See* 3 Oct. 2024 Order, ECF No. 91. On 17 October 2024, the government responded. *See* Gov't's Suppl. Resp. Br., ECF No. 92.

## III. The Parties' Arguments

The Court begins by summarizing the parties' arguments regarding ambiguity of the Contract and whether the implied duty of good faith and fair dealing was breached.

### A. Parties' Arguments Regarding the SBIR Contract's Ambiguity

As an initial matter, the parties disagreed on whether the Contract is ambiguous. The government argued the Contract is clear and unambiguous, and the Court should consider only the four corners of the contract. Plaintiff, however, argued the Contract is ambiguous, and the Court should consider extrinsic evidence in evaluating the claim for breach of implied duty of good faith and fair dealing.

The government argues "under the clear and unambiguous terms of" the Contract, plaintiff "agreed to develop and deliver a next-generation composite pallet with a corresponding" TDP to USAF "with SBIR data rights." Gov't's MSJ at 13. Specifically, per the government, the Contract requires plaintiff to "develop/produce/maintain and deliver a TDP that accurately depicts the final product," stating "'[a]ll engineering product definition data created using

Government funding as a result of this contract shall be considered a part of the TDP and shall be delivered . . . in accordance with the . . . Product Data Specification drawing," *id.* at 14 (citing Work Plan at 22–23) (emphasis omitted), and among other things "use Warner Robins Air Logistics Center's Commercial and Government Entity (CAGE) number (98752), Air Force drawing numbers, and include certain Air Force Personnel in the signature block," *id.* at 15 (citing App'x at 694 (TDP Format Requirements)). In the government's view, the Contract provides a Draft TDP "sufficient to allow competitive re-procurement . . . be initiated for the new design at the completion of the Phase II effort," *id.* (citing Work Plan at 22) (emphasis omitted), and "must be delivered in accordance with Contract Data Requirements List (CDRL)," *id.* at 15 (Contract at 41). According to the government, it agreed to pay plaintiff $1,488,250.66 "to develop a new composite pallet" consistent with the Work Plan. *See id.* at 13–14 (citing App'x at 3 (Solicitation, Offer, and Award), 71 (Data Rights Clause), Work Plan at 23 (emphasis omitted). Next, the government claims the Contract "set[s] the specific level of detail and format requirements for" the Draft TDP, which should be interpreted in their "plain and ordinary meaning" and without "extrinsic evidence." *See* Gov't's MSJ at 13. The government avers plaintiff cannot rely on the Small Business Innovative Research Technology Transition Plan ("STTP") to argue trade practice and custom is reflected in the STTP because it "does not even suggest that there are industry meanings of initiate and [Draft TDP] and completion of Phase II different from their ordinary meanings." *Id.* at 18 (emphasis omitted). The argument continues, even if the STTP is used as extrinsic evidence, the STTP supports the government's position it obtains data rights under Phase II given "only if" USAF "obtains SBIR data rights . . . could it ultimately acquire a technical data package for use in competitive procurement." *Id.* at 19.

In response, plaintiff argues the Court should "not limit its analysis strictly to the four corners of the Contract" and must consider the SBIR Policy Directive and the STTP "to determine whether [USAF] used subterfuge and acted with dishonesty or bad faith to appropriate" the Draft TDP. Pl.'s CMSJ at 10. Specifically, plaintiff argues USAF "prematurely demanded" a Draft TDP even though "it knew such demands contradicted the Contract's 'spirit and purpose.'" *Id.* at 9 (citation omitted). Per plaintiff, the STTP "demonstrates the 'spirit and purpose' of the [C]ontract," "plays a fundamental role in interpreting the Contract's terms and expectations, including the '[D]raft TDP,' and demonstrate[s] the timeline the [p]arties envisaged for Sunrez to initiate the" Draft TDP. *Id.* at 22 ("STTP contains a chart that demonstrates the levels of product and data maturity that could yield a TDP, and what form it would take at each stage." (quoting App'x at 1387 (STTP)). In plaintiff's view, USAF did not reference the STTP chart or deny "it provided needed context to an undefined term, name, Draft TDP," but instead "sought to exclude it . . . to misrepresent the actual timeline for the initiation of the" Draft TDP. *See id.* at 22–23. Next, plaintiff contends the SBIR Policy Directive should be considered because it was meant "to regulate [USAF]'s conduct" in the Contract and "controlled [USAF]'s conduct in SBIR contracts." *Id.* at 17–18 ("[F]ederal agencies participating in the SBIR Program (SBIR agencies) are obligated to follow the guidance provided in this Policy Directive." (quoting Appx at 1824 (SBIR Policy Directive)). Per plaintiff, the Contract required plaintiff only to "initiate" a Draft TDP "sufficient to allow competitive re-procurement and spares procurement for the new design after SBIR Phase II efforts." *Id.* at 22. Plaintiff then provides the Merriam-Webster dictionary definition for the term "initiate" to support its interpretation providing it is defined there as "to enter upon" or "to

cause or facilitate the beginning of." Pl.'s CMSJ at 22 (quoting Merriam-Webster Dictionary (59th ed. 2021)).

**B. Parties' Arguments Regarding the Implied Duty of Good Faith and Fair Dealing**

The parties also argue over whether the government breached the implied duty of good faith and fair dealing. The government argues it was enforcing its rights under the Contract's plain language and therefore did not breach the implied duty of good faith and fair dealing. Plaintiff argues the government breached its implied duty of good faith and fair dealing by trying to obtain plaintiff's data.

Specifically, the government argues plaintiff seeks to avoid its contractual obligation to deliver a Draft TDP by alleging "even before the Contract was awarded," USAF pressured plaintiff "into giving up its intellectual property by requiring a Level III TDP for a Phase II.5 effort.'" Gov't MSJ at 19 (quoting Am. Compl. ¶ 40). The government contends, even if this were true, plaintiff "could have refused to sign" the Contract "if it did not want to agree to the level of detail required" or agree to delivery of the Draft TDP. *Id.* at 20. Next, the government claims plaintiff "repeatedly refused to deliver" a Draft TDP as required by the contract on its face, and even after submitting the Draft TDP Final Prototype drawings in mid-December 2017, plaintiff "did not include details that would be required to build the pallet." *Id.* at 22–24 (citing App'x 1239) (detailing examples of communications between the parties regarding plaintiff's deficiencies in the Draft TDP). Moreover, the government alleges USAF "agreed to amend the contract to add the SBIR data rights clause," which contained a process for plaintiff to "assert data rights to protect any alleged background technologies before affixing limited rights markings on the technical data," but despite the clause being added, plaintiff "failed to make such assertions to justify its limited rights markings and allegations." *Id.* at 25. Per the government, the evidence shows despite USAF's "repeated requests" for a Draft TDP as required by the contract, plaintiff's Draft TDP "'Final Prototype drawings' did not give details of the composite core, did not accurately depict the dimensions of the prototype pallet, and did not satisfy the contractual format requirements." *Id.*

Further, the government argues USAF's "reminder" that the data rights were part of the contractual bargain was not pressuring plaintiff to "relinquish its intellectual property;" rather it was USAF's intent "to receive the contractually required technical data package before [P]hase III," not "unlimited rights under the contract." *See id.* at 24–27. Regarding the SBIR Policy Directive and STTP, the government argues they do not indicate "a preliminary pallet design had already been initiated" prior to the Contract, rather the purpose for SBIR contracts are to give small businesses the opportunity to "develop an idea and in return USAF obtains unlimited rights." *Id.* (cleaned up). Per the government, just because plaintiff "had a preliminary design" does not mean USAF "failed to recognize [plaintiff's] alleged background technologies" given USAF "was pursuing" what plaintiff "promised to deliver (in exchange for [g]overnment development funding) under the SBIR [P]hase II contract." Gov't MSJ at 29.

Finally, the government argues it was not "dishonest" because: (1) plaintiff "concedes that originally it was 'tasked with designing a pallet' to a specification contradicts its allegation that it developed the composite pallet" before the SBIR Phase II Contract; (2) the Contract

provided plaintiff's pallet was to "meet or exceed the performance of the current balsa/aluminum pallet," and developing a pallet with an exceeding safety factor is not beyond the scope of the Contract; (3) USAF did not cease communication with plaintiff, but rather continued to communicate with plaintiff to get a Draft TDP; (4) there is no evidence USAF's "decision not to move forward with the composite pallet was . . . related to the separate effort regarding the aluminum pallet" or "motivated by retaliation;" and (5) USAF not rescinding its written allegations about plaintiff's pallets was due to plaintiff not conforming with USAF's testing and requirements." *See id.* at 34–37 (emphasis omitted).

In response, plaintiff argues USAF breached its implied duty of good faith and fair dealing. Specifically, plaintiff asserts it "should have been able to rest confidently in its SBIR Data Rights and not been targeted for adverse subterfuges and manipulations for its refusal to relinquish them," but "[u]nfortunately, this is what happened, and such was a clear breach of the implied duty of good faith and fair dealing." Pl.'s CMSJ at 15. Per plaintiff, "the Contract developed to the stage where [the] prototype composite 463L pallets were expected to undergo full-scale simulation testing and environmental/airworthiness certification," but it did not occur due to USAF's refusal to cooperate. *See id.* (quoting Work Plan at 20; Pl.'s Proposed Findings of Uncontroverted Fact ("PFUF") ¶¶ 6, 9, ECF No. 73). Plaintiff claims the evidence shows USAF's "cooperation on the Contract would avail Sunrez the benefit of observing its composite pallets to achieve airworthiness." *Id.* at 16.

Plaintiff next argues USAF had an implied duty in the Contract to adhere to the SBIR Policy Directive, which "imposed several duties on" USAF, including, prohibiting USAF "from exerting pressure to coerce Sunrez to relinquish, transfer, or modify its SBIR data rights under the Contract" and "making issuance of an SBIR Phase III award conditional on data rights." *Id.* at 17–18 (citing PFUF ¶¶ 2–4). Plaintiff contends USAF specifically violated these implied duties when it: (1) "admitted it e-mailed Sunrez an MOU requiring that for an SBIR Phase III to be awarded, Sunrez needed to deliver a Draft TDP acceptable to" USAF; (2) "posited that Sunrez should not retain ownership of the data remaining with Sunrez for the draft or any TDP;" (3) proposed in the MOU "to retroactively accelerate the timeline Sunrez was required to deliver a [D]raft TDP;" (4) "did not produce any successful First Article report or government verification on Sunrez's composite pallets;" and (5) "ceased cooperating and undertook other adverse actions and subterfuges that pursues its improper objectives and ignored those of the SBIR Program." *Id.* at 23–24.

Lastly, plaintiff argues USAF intentionally performed "some variation of the old bait-and-switch" and "specifically designed [the Contract] to reappropriate the benefits the other party expected to obtain from the transaction," by "accelerat[ing] the expected timeline for Sunrez to deliver a Draft TDP and a Level III TDP, while simultaneously elevating its performance requirements above others to exclude any opportunities." *Id.* at 26 (citations and quotations omitted).

## IV.    Applicable Law

Given the parties' arguments regarding the Contract's language and whether the implied duty of good faith and fair dealing was breached, the Court details the applicable law for contract interpretation and the implied duty of good faith and fair dealing below.

### A. Contract Interpretation

"When deciding an issue governed by the text of a legal instrument, the careful lawyer or judge trusts neither memory nor paraphrase but examines the very words of the instrument." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 56 (2012). This is because "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Id.* As such, "[c]ontract interpretation begins with the plain language of the agreement." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). "A contract is ambiguous only when it is susceptible to two reasonable interpretations." *Hunt Const. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (quoting *A-Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed. Cir. 1994)). "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" *NVT Techs., Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004) (citation omitted).

When interpreting a contract, one must consider it as a whole and interpret it to harmonize and give reasonable meaning to all its parts. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996); *Gould*, 935 F. 2d at 1274 ("[P]rovisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result."). If a contract's provisions are "clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them." *McAbee*, 97 F.3d at 1435 (cleaned up). "To permit otherwise would cast a long shadow of uncertainty over all transactions and contracts." *Id.* (cleaned up). "The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face." *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988).

### B. The Implied Duty of Good Faith and Fair Dealing

"Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). This implied duty is inherent and is also called the implied duty not to hinder and the implied duty to cooperate. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 827–28 (Fed. Cir. 2010). Under this duty, a party is required "to not interfere with another party's rights under the contract." *Id.* at 828. A party's failure to fulfill this implied duty constitutes breach. *See Metcalf*, 742 F.3d at 990.

A party fails to abide by the implied duty of good faith and fair dealing when it "interfere[s] with the other party's performance" and "act[s] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Dobyns*, 915 F.3d at 739 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). "Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch." *Precision*, 596 F.3d at 829. A "bait-and-switch" can be described as having two steps: (1) "the government enters into a

contract that awards a significant benefit in exchange for consideration;" and (2) "the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract." *Id.*

In determining whether a party has breached the implied duty of good faith and fair dealing, a court must examine whether a party's acts "destroy[s] the reasonable expectations of the other party regarding the fruits of the contract," and this examination is intertwined with the contract and facts of a case. *See Centex*, 395 F.3d at 1304 (citations omitted); RESTATEMENT (SECOND) OF CONTS. § 205 cmt. d (stating potential breaches of the implied duty of good faith and fair dealing include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance").

## V. Analysis of the Language of the SBIR Contract

The parties' contract disagreement fundamentally concerns Task 4 of the Work Plan, particularly the introductory sentence and the word "initiated": "A Draft Technical Data Package (TDP) sufficient to allow competitive re-procurement and spares procurement shall be initiated for the new design at the completion of the Phase II effort." *See* Work Plan at 22. The government asserts this language, when read in full, requires delivery of a Draft TDP. Tr. at 16:16–23 ("[THE COURT:] [F]rom the [g]overnment's perspective . . . the contract read as a whole is not ambiguous. And . . . there is a TDP required? [GOVERNMENT:] That's correct . . . It's not ambiguous. And, . . . if you read [the Contract] as a whole, it requires [plaintiff] to deliver a TDP."). Plaintiff argues the introductory sentence, specifically "initiate," is ambiguous. *See* Pl.'s CMSJ at 22–23 (explaining why the term initiate is ambiguous). When asked at oral argument whether the Contract was ambiguous, plaintiff first sidestepped the question, then agreed the Contract does not require delivery of Draft TDP. *See* Tr. at 16:7–16:12 ("[THE COURT:] [When plaintiff read[s] the contract as a whole, [plaintiff is] not arguing that the contract is ambiguous but the contract does not require a TDP? . . . [PLAINTIFF:] [T]hat's accurate."). To fully review all plaintiff's arguments and the contract requirements, the Court first determines whether it can consider extrinsic evidence. The Court then analyzes the introductory Task 4 sentence for ambiguity and considers other language within the Contract to determine whether Task 4 is ambiguous as to delivery of the Draft TDP. Finally, the Court determines what level of detail the Contract required in the Draft TDP.

### A. Whether the STTP and SBIR Policy Can be Considered to Assist the Court in Interpretation of the Contract

As an initial matter, the parties disagree whether the Court should limit its analysis to the four corners of the contract, or if extrinsic evidence can be considered. *Compare* Gov't's MSJ at 17–18 (arguing plaintiff's interpretation of the Contract is "inconsistent with its clear and unambiguous terms" and plaintiff "cannot show that the ordinary meaning of its requirement to deliver a draft technical data package is ambiguous and extrinsic evidence cannot be used to "'introduce ambiguity where none exists.'"), *with* Pl.'s CMSJ at 10 (arguing the Court should "not limit its analysis strictly to the four corners of the contract"). Notably, at oral argument, plaintiff agreed "the general rule is that extrinsic evidence is not allowed to change the terms of

the contract." *See* Tr. at 11:16–25. The Court therefore can only consider extrinsic evidence to aid in interpretation of the Contract if the Contract's provisions are not "clear and unambiguous" and cannot "be given their plain and ordinary meaning." *McAbee Constr., Inc. v. United States*, 97. F.3d 1431, 143435 (Fed. Cir. 1996) ("[I]f the [contract's] provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them."). Accordingly, if the Contract is clear and unambiguous, the Court will not consider extrinsic evidence to aid in its interpretation.

### B. Whether the Introductory Sentence of Task 4 is Ambiguous

The first sentence of Task 4 states: "A Draft Technical Data Package (TDP) sufficient to allow competitive re-procurement and spares procurement shall be initiated for the new design at the completion of the Phase II effort." Work Plan at 22. To determine whether ambiguity exists, the Court must first begin with the language of the written agreement. *See Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 56 (2012). "Contract interpretation begins with the plain language of the agreement." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). Thus, the Court begins by determining the meaning of the word "initiated."

Plaintiff offered the dictionary definition of initiate: "to enter upon" or "to cause or facilitate the beginning of." Pl.'s CMSJ at 22; *see Initiate*, WEBSTER'S THIRD NEW INTERNATION DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (59th ed. 2021). The government did not offer a definition for initiate and agreed with plaintiff's proffered definition. *See* Tr. at 20:3–12 ("[THE COURT:] [T]he [g]overnment did not offer a definition of 'initiate.' Plaintiff[] went to Merriam-Webster and argued that initiate means 'to cause the beginning of.' Do you agree with that[?] . . . [GOVERNMENT:] Yes."). At oral argument, the government confirmed it was not asking the Court to ignore the introductory sentence and was instead asking for the sentence to be read with the rest of Task 4 to make clear "the parties [were] initiating . . . the technical data package process." *See* Tr. at 27:10–20. As such, the term "initiated" can be given its plain and ordinary meaning, and the introductory sentence can be read as: "A Draft Technical Data Package (TDP) sufficient to allow competitive re-procurement and spares procurement shall [] begin for the new design at the completion of the Phase II effort." *See McAbee*, 97 F.3d at 1434– 35 ("[I]f the [contract's] provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them.").

### C. Whether the Draft TDP Delivery Timeline in Task 4 of the Work Plan is Ambiguous

Having determined the introductory sentence is clear and unambiguous, the Court next determines whether the Contract is ambiguous as to *if* and *when* delivery of the Draft TDP must occur. When interpreting a contract, the document must be considered as a whole and interpreted to harmonize and give reasonable meaning to all its parts. *See McAbee*, 97 F.3d at 1434–35. The Court must therefore examine the introductory sentence with the plain meaning of "initiated" relative to the rest of Task 4. In doing so, the Court construes the Contract's provision "as to effectuate its spirit and purpose" and will "give[] a reasonable meaning to all of its parts" to ensure the interpretation does not "leave[] a portion of it useless, inexplicable,

inoperative, void, insignificant, meaningless, superfluous, or achieve[] a weird and whimsical result." *Gould*, 935 F.2d at 1274 (citation omitted).

Plaintiff contends the government "prematurely demanded" a Draft TDP even though "it knew such demands contradicted the Contract's 'spirit and purpose.'" Pl.'s CMSJ at 9. In plaintiff's view, if the Contract "is read correctly and in context, the only proper interpretation" would be a Draft TDP "was only to be 'initiated,' and not delivered, during Phase II." *See id.* at 1–2 ("It presents an impossible objective for the [g]overnment to demand a TDP sufficient to allow competitive re-procurement . . . after a build of a mere six [] pallets."). The government, however, argues Task 4 required delivery of a Draft TDP, and it would not have been impossible for plaintiff to comply with the Contract's requirements. *See* Gov't's MSJ at 13–14. Although the introductory sentence may be ambiguous in isolation, the rest of Task 4 clarifies the Draft TDP was to be created over the course of the Contract and eventually delivered through an iterative process. *See* Tr. at 26:21–27:9 ("[GOVERNMENT:] [I]t's going to be an iterative process between [the parties] . . . [and] it's clear that [plaintiff] ha[s] to deliver what they're initiating."). The Court thus reviews the entirety of Task 4 as to not render the introductory sentence's meaning impermissible.

As established *supra* Section V.A, the introductory sentence refers to the process of creating the Draft TDP, and indicates the Draft TDP was not only to be started but was also meant to be a deliverable under Task 4. *See* Work Plan at 20–30. The rest of Task 4 provides the necessary context to clarify the meaning of this process. As a whole, Task 4 describes the process the parties were to undergo and provides a timeline. The introductory sentence explains the Draft TDP was to be "initiated." *Id.* at 22. Plaintiff was then required to "develop/produce/and maintain" the Draft TDP throughout the process. *Id.* Plaintiff would next "deliver a TDP that accurately depicts the final product," and the Draft TDP was to "be delivered in accordance with Air Force Product Data Specification[s]." *Id.* at 22–23. While Task 4 does not specify the timing of the Draft TDP's delivery, it provides the Draft TDP had to be delivered prior to a Phase III contract. *See* Tr. at 29:2–30:18 ("[THE COURT:] So where in [Task 4] does it specify that the TDP should be delivered at the end of Phase II? . . . [GOVERNMENT:] Well, there's no sentence in [Task 4] that says it has to be delivered at the end of Phase II. . . . It's a requirement in the Phase II contract, so it has to be delivered by the end of the term of the Phase II contract. It's a requirement in this contract."); Work Plan at 22. Specifically, the introductory sentence requires the Draft TDP to be "sufficient to allow competitive re-procurement and spares procurement," which can only occur in Phase III. *Id.*

At oral argument, the government confirmed the timeline provided by Task 4. *See* Tr. at 33:12–25 ("[THE COURT:] [T]he timeline was for the prototypes to be created, delivered, tested, and then still ongoing Phase II, the TDP draft was being created and . . . the prototypes were being tested, and then at the end of Phase II . . . is when the TDP was due. [GOVERNMENT:] That's . . . correct . . . . The TDP was due after testing . . . was confirmed. Because it has to reflect the tested product. . . . So if [plaintiff] . . . change[d] the pallet . . . to pass a retake of the test, that has to be reflected in the [TDP]."). Plaintiff did not agree with this timeline, arguing the Draft TDP could not be delivered because the prototype never passed testing and its configuration was not approved. *See* Tr. at 35:8–21 ("[THE COURT:] [D]o you agree with the timeline of prototype due and then TDP being worked on as to while the prototype

- 12 -

is being tested? . . . [PLAINTIFF:] Well, sometime before the end of Phase II . . . testing had to be done. And it had to be accepted . . . and then the configuration approved. And so that's precisely why . . . [the Draft TDP] couldn't be initiated until the very end."). Plaintiff's interpretation, however, is inconsistent with the greater contract because it would result in a Phase II product being unable to undergo Phase II testing. The Work Plan not only requires plaintiff to "develop/produce/maintain and deliver a TDP," it also requires the "design documentation" in the Draft TDP to be "*updated* to include any modifications as a result of design optimization performed during the [Phase II] testing process." Work Plan at 25 (emphasis added). These "updates," however, could not occur without a Draft TDP at the start of Phase II testing. Put simply by government counsel: "The Air Force isn't going to put something on their planes that they don't know what it's made out of"—USAF cannot begin Phase II prototype testing without the Draft TDP. Tr. at 73:16–22 ("[GOVERNMENT:] [USAF] can't do [testing or ATTLA] certification without a technical data package. The Air Force isn't going to put something on their planes that they don't know what it's made out of.").

Plaintiff further argues the Draft TDP could not be delivered until after the award of Phase III. *See* Pl.'s CMSJ at 9. At oral argument, plaintiff argued the Draft TDP could not be due until more than 2,000 pallets were produced. *See* Tr. at 44:14–19 ("THE COURT: So is it Sunrez's position that the TDP would not be due until there was a greater production of some 2,000 pallets[?] . . . [PLAINTIFF:] [T]hat has to be the case."). When asked how USAF could procure 2,000 pallets without a Draft TDP, plaintiff stated USAF would not "have to have the TDP if [it was] going to do . . . a low-volume production run with the person . . . that actually designed it." *See* Tr. at 44:20–45:1. Plaintiff maintained USAF did not have the right to receive the research and development data—which USAF paid for—from plaintiff as part of Phase II and then initiate a competitive procurement for Phase III. *See* Tr. at 48:18–22 ("THE COURT: So does Sunrez think that the Air Force did not have the right to receive the R&D data from Sunrez as part of Phase II and then initiate a competitive procurement for Phase III? [PLAINTIFF:] That is exactly what we think."). This argument however, conflicts with the language of Task 4, which requires a Draft TDP "sufficient to allow competitive re-procurement" and "provide the necessary design, engineering, manufacturing, testing and quality assurance requirements information necessary to enable the procurement . . . without additional design engineering effort or recourse to the original design activity or any third party." Work Plan at 22–23. Additionally, as concluded in the 20 January 2022 Order, the government was under no obligation to award plaintiff a Phase III contract. *See Sunrez*, 157 Fed. Cl. 667–68; *Night Vision Corp. v. United States*, 469 F.3d 1369, 1373–75 (Fed. Cir. 2006) (explaining the government has no obligation to award a Phase III contract following a successful Phase II contract). Thus, delivery of a Draft TDP was not first required in Phase III as plaintiff contends; rather, it was to be delivered during Phase II and prior to the award of a Phase III contract. Without the Draft TDP, the government would not have the "necessary design, engineering, manufacturing, testing, and quality assurance requirements information necessary to enable the procurement or manufactur[ing]" of the pallets. Work Plan at 22–23; *see id.* ("All engineering product definition data created using [g]overnment funding as a result of this contract shall be considered a part of the TDP and shall be delivered to the [g]overnment."). Therefore, without a Draft TDP, USAF could not accurately determine whether plaintiff's pallets were a candidate for a Phase III contract. *See id.* at 22 ("The TDP shall represent the approved, tested, and accepted configuration of the defined delivered item(s).").

**D.  The Required Level of Detail for the Draft TDP Under the Contract**

The parties further disagree what level of detail was required to be in the Draft TDP under the Contract.  The government contends the Draft TDP should "accurately depict the final product" and "all engineering product definition data created using government funding as a result of this contract shall be considered a part of the TDP" and "delivered in accordance with USAF Product Data Specifications."  Gov't's MSJ at 14 (citing Work Plan at 22–23) (cleaned up).  The government also argues the Draft TDP "must be 'sufficient to allow competitive re-procurement' and must be delivered in accordance with Contract Data Requirements List (CDRL)."  *Id.* at 14–15 (citing Contract at 41).  According to the government, plaintiff was required to follow the "specific format requirements for the engineering drawings and models," and, among other things, "use Warner Robins Air Logistics Center's Commercial and Government Entity (CAGE) number (98752), Air Force drawing numbers, and include certain Air Force Personnel in the signature block."  *Id.* (citing App'x at 41 (Contract), 694 (CDRL Requirements)).  Plaintiff counters, arguing USAF requested a Level III Draft TDP "sufficient to allow for competitive re-procurement" and if the contract is "read correctly and in context, the only proper interpretation" would be a Draft TDP "was only to be 'initiated' . . . during Phase II."  Pl.'s CMSJ at 1.  Plaintiff therefore argues "it presents an impossible objective for the [g]overnment to demand a TDP sufficient to allow competitive re-procurement for Sunrez's 463L composite pallets, otherwise known as a Level III TDP, after a build of a mere six [] pallets [] during an SBIR Phase II contract."  *Id.* at 2.  As the Court already determined it was possible for plaintiff to deliver a Draft TDP, *see supra* Section V.B, the Court must now determine what level of detail was required in the Phase II Draft TDP that should have been delivered.

As an initial matter, despite the Court determining extrinsic evidence, such as the SBIR Technology Transition Plan, is not allowed for contract interpretation, the Court still makes reference to demonstrate other materials do not support plaintiff's position.  *See* App'x at 1365–98 ("STTP").  Specifically, the Court considers the chart contained in the STTP, entitled "Technical Data Package Timeline for Redesigned 463L Pallet Project."  *Id.* at 1387.  At the time of delivery for six prototype pallets, the chart denotes the Draft TDP should include the "[m]echanical design, physical properties and basic material specifications with design drawings."  *Id.*  At oral argument, plaintiff confirmed this was the minimum level of detail required.  *See* Tr. at 58:24–59:13 ("[THE COURT:]  [I]f we look on the left side of the chart at the first hash mark that says prototype . . . all of the other point moving along the timeline indicate that prototype basic design data is the . . . initial draft TDP because everything else is then added onto it.  [PLAINTIFF:]  That's true.").  Additionally, 2(a) in the chart is labeled "Basic Design Data", and corresponds to a more comprehensive description of what such data includes:  "This stage of the [] TDP development process includes the basic mechanical design, material selection, and physical properties which are analyzed, fabricated and tested in the sub system and system configurations, defining the initial methodology for manufacture of this protype design.  TDP documentation of the prototype design is outlined and drafted including all pertinent sections needed for an open procurement by the government upon completion."  STTP at 1388.  This explanation further supports USAF will use the Draft TDP for an "open procurement."  *See supra* Section V.B.  Plaintiff also acknowledged basic design data could be included with the prototypes.  *See* Tr. at 58:9–13 ("[PLAINTIFF:]  [T]he basic design data is the mechanical design physical properties and basic materials specifications with design drawings.  .

- 14 -

. . . [T]hat's the basic design data that's possible when you have . . . six hand-built units."). As such, plaintiff should have included at least the basic design data in the Draft TDP. *See* Work Plan at 22–23 ("TDP Data includes, but is not limited to, Computer Aided Design (CAD) data, CAD modes, model based definition data sets . . . . The TDP shall provide the necessary design, engineering, manufacturing, testing and quality assurance requirements information necessary to enable the procurement or manufacture of an interchangeable item that duplicates the physical and performance characteristics of the original product[.]").

Plaintiff further argues the STTP chart reproduced below shows a Draft TDP was not required until at least the production of 2,000 pallets, *see supra* Section V.B, because the arrow on the chart next to "Draft TDP w/ Initial Tooling/Assembly Data" points to the line for the production of 2,000 pallets. *See* Tr. at 58:1–23 ("[PLAINTIFF:] The top arrow, that's right next to draft TDP, look at where that's supposed to occur. When you follow that line down, it's supposed to occur during the initial production of 2,000 units, not during the hand building of six units.").



STTP at 1387. The government argues "Draft TDP" does not show up on the chart until the point of production of 2,000 pallets because this chart "was the preliminary outline of the process" and "Draft TDP is not a term of art,"—but rather "it's a preliminary version"—and "[i]n this case, the preliminary version requires documentation" and a Draft TDP "with sections needed for open procurement." Tr. at 59:14–61:4. The government further argues the STTP chart should be excluded as extrinsic evidence because it predates—and was superseded by—the Contract. *See* Tr. at 61:5–62:16. The Court agrees with the government. The STTP chart is extrinsic evidence, and even itself notes it is a "non-binding agreement." *See* STTP at 1376. Further, as explained *supra*, the STTP supports the Draft TDP is to be built upon and used for an "open procurement." This is also supported by Task 4, which states the Draft TDP should be

"sufficient to allow competitive re-procurement."  *See* Work Plan at 22; *see also supra* Section V.B.  Thus, both the extrinsic evidence and the Contract indicate the Draft TDP should contain sufficient detail for USAF to obtain production through competitive procurement.

Plaintiff also belies logic arguing it could have drafted part of the Draft TDP without completing the complete Draft TDP until well into a Phase III contract.  As explained *supra*, plaintiff agreed it could have included at least the basic design data in the Draft TDP.  Although plaintiff maintained the initial Draft TDP was identical to the detail given for the legacy pallet and provided enough detail to understand the prototype approach, *see* Tr. at 10:15–20 ("[PLAINTIFF:]  [The TDP] gives you enough to show what the prototype approach was."), plaintiff admitted the Draft TDP was insufficient for manufacturing the pallet, *see* Tr. at  11:9–15 ("[THE COURT:]  But you agree that what was submitted in July of 2017 . . . for a TDP, you would have to know a little bit more . . . to actually manufacture?  [PLAINTIFF:]  Exactly like the legacy pallet, yes.").  Plaintiff, however, argued the revised Sunrez-submitted Draft TDP contained sufficient detail on the core for a third party to manufacture the pallet, *see* Tr. at 111:20–112:1 ("[THE COURT:]  It's Sunrez's position that . . . the material detail of the core is sufficient for what Sunrez provided for a third party to go out and manufacture the pallet? [PLAINTIFF:]  Yes."), because the revised Sunrez-submitted Draft TDP "referenced a part number of material and the material is something that could be ordered from" plaintiff, *see* Tr. at 112:2–15, despite the Draft TDP merely stating it was a "fiberglass interior," *see* Tr. at 109:15–110:7.  Plaintiff also argues USAF possessed the data sheet related to the core, *see* Tr. at 124:2–4 ("[PLAINTIFF:]  [T]he [g]overnment was provided a data sheet for [the core] material and for [the core's] part number."), even though plaintiff agreed it was never included in the Draft TDP and instead was provided separately, *see* Tr. at 124:9–10 ("[PLAINTIFF:]  [The data sheet] was provided separately.").  The government disagrees, arguing the Sunrez-submitted Draft TDP referencing a part number and describing the core as a fiberglass material does not "depict the final product" and "what [materials are] inside the pallet."  *See* Tr. at 112:5–20.  According to the government, "the TDP should include the specifics of . . . information from the patent specification and the claims" to sufficiently disclose "the manufacturing and the composition," *see* Tr. at 112:21–113:8, and the "drawing package should accurately depict the final product" and "include all items required to build the pallet from start to finish," *see* Tr. at 113:9–24 ("[GOVERNMENT:]  The drawing package should accurately depict the final product, which is exactly from the contract.  This should include, at a minimum, details such as the gauge of the fiberglass, thickness and density of the foam, internal tubing, to include dimensions and material, bonding agents, vendor controlled items, form, fit, function in accordance with mill specifications.  All items required to build the pallet from start to finish, including order of construction, should be in the drawings.").  As discussed *supra*, USAF desired to use the Draft TDP for open procurement of the pallets.  If the information USAF paid for is not included in the Draft TDP, procurement could not proceed because no manufacturer could replicate the process.  *See* Tr. at 73:5–74:2 ("[GOVERNMENT:]  How can the Air Force decide to move on to Phase III [(*i.e.,* open procurement)] if it doesn't have the technical data package from Phase II? . . . The Air Force isn't going to put something on their planes that they don't know what it's made out of . . . .  The [TDP] required to be delivered under the contract had to depict the final product.").  Thus, under the Contract, the Draft TDP should have enough detail to "accurately depict[] the final product" and "allow competitive re-procurement and spares procurement." Work Plan at 22; *see Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014)

("Contract interpretation begins with the language of the written agreement.  If the provisions are clear and unambiguous, they must be given their plain and ordinary meaning." (cleaned up)).  Accordingly, the Court next analyzes whether the government breached the implied duty of good faith and fair dealing.

## VI.    Analysis of the Implied Duty of Good Faith and Fair Dealing

In analyzing whether USAF breached the implied duty of good faith and fair dealing, the Court begins by determining if a breach of the implied duty is limited to the express provisions of the Contract.  The Court then analyzes whether USAF breached its implied duty through its: (1) testing of plaintiff's pallets; (2) decision not to move forward with plaintiff for a Phase III contract; and (3) communications, or lack thereof, with plaintiff.  Finally, the Court examines whether plaintiff could prove USAF desired data rights above all else and therefore breached its implied duty.

### A.    Whether a Breach of the Implied Duty of Good Faith and Fair Dealing Is Limited to the Express Provisions of the Contract

At oral argument, the parties agreed with the applicable law regarding the implied duty of good faith and fair dealing summarized in the Court's 20 January 2022 Order.  *See* Tr. at 77:13–78:9 ("[THE COURT:]  [Do the parties] agree with the applicable law sections regarding good faith and fair dealing that was summarized in the Court's motion to dismiss order form January 2022?  [PLAINTIFF:]  [Y]es . . . .  [GOVERNMENT:]  [W]e agree.").  That Order confirmed a breach of the duty of good faith and fair dealing needs not be limited to the express provisions of a contract.  *Sunrez Corp. v. United States*, 157 Fed. Cl. 640, 661 (2022) (explaining a breach of the implied duty of good faith and fair dealing requiring an express provision in a contract "goes too far:  a breach of the *implied* duty of good faith and fair dealing does not require a violation of an express provision in the contract" (quoting *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 992 (Fed. Cir. 2014) )).  The parties also agreed to prove a breach "a specific promise must be undermined for the implied duty to be violated."  *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019); *see* Tr. at 78:10–81:13 (discussing *Dobyns* and agreeing it "is precedential and good law for the Court to follow").

Here, plaintiff argues USAF "undermined" the specific promises and obligations regarding plaintiff's SBIR Data Rights by requiring delivery of the Draft TDP, constituting a breach of the implied duty of good faith and fair dealing.  *See* Tr. at 81:6–13 ("[THE COURT:] [T]he analysis of good faith and fair dealing from Dobyns here is that the specific promises and obligations regarding the TDP were undermined.  [PLAINTIFF:]  The data rights in the TDP, yes.  First off, you know, one, it had to be delivered at that level; and secondly, that it had to be delivered at all in Phase II.").  Plaintiff asserts it "should have been able to rest confidently in its SBIR Data Rights and not been targeted for adverse subterfuges and manipulations for its refusal to relinquish them," and "[u]nfortunately, this is what happened, and such was a clear breach of the duty of good faith and fair dealing."  Pl.'s CMSJ at 15.  In failing to identify a specific contract provision, plaintiff relies only on extrinsic evidence—the STTP and SBIR Policy Directive—to support its position USAF undermined a specific extrinsic contractual promise.  *See generally* Pl.'s CMSJ.

- 17 -

At oral argument, the Court requested plaintiff to identify a specific promise in the Contract that was undermined, but all plaintiff could offer as evidence was USAF "requiring delivery of data rights in Phase II," which it alleged was a violation of a "specific SBIR [p]olicy." *See* Tr. at 87:2–23. Plaintiff purported USAF requiring delivery of a Draft TDP prior to awarding a Phase III is "an automatic violation of SBIR policy" and is "illegal." *See* Tr. at 91:14–23 ("[THE COURT:] [I]f the Court were to find, looking at the contract, that the [D]raft TDP was to be delivered in Phase II, and that there was no duty on the party of the [g]overnment to award a Phase III, could there be a violation of good faith and fair dealing? [PLAINTIFF:] Yeah, because it's an automatic violation of SBIR policy. . . . It's illegal."). Relying on the SBIR Policy Directive, plaintiff alleges "if data rights were required to be turn[ed] over in Phase II, then the [C]ontract, in and of itself, would be a violation of good faith and fair dealing." Tr. at 91:24–92:5. The Court, however, already determined extrinsic evidence could not be considered because the Contract is clear and unambiguous. *See supra* Section V. The Court also determined plaintiff was not guaranteed a Phase III contract, and the Contract required delivery of the Draft TDP prior to a Phase III award. *See supra* Section V.C. Plaintiff therefore cannot rely on the STTP and SBIR Policy Directive to prove a specific promise of the Contract was undermined. To the extent plaintiff asks the Court to rely on extrinsic evidence because it purportedly "demonstrates the 'spirit and purpose' of the Contract," *see* Pl.'s CMSJ at 22–24, the Court cannot use extrinsic evidence for such a purpose, *see Dobyns*, 915 F.3d at 740 (explaining a court must "ground[] the supposed duties in the specific provisions of the contract" and cannot rely on "obligations [] well beyond those contemplated in the express contract"). As plaintiff has not identified a specific promise in the Contract the government undermined, plaintiff cannot sustain its claim for breach of the implied duty of good faith and fair dealing on the contract. *See Metcalf Const.*, 742 F.3d at 992 (explaining a court "need[s] to take account of the particular contract at issue in considering a claim of breach of the good-faith-and-fair-dealing duty implicit in that contract").

### B. Whether the Government's Lack of Testing of the Prototype Pallets Was a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff further alleges the government breached the implied duty through not testing plaintiff's prototype pallets. *See* Am. Compl. at 19 ("[R]etaliation is the only conceivable motive for why the [g]overnment would opt to breach its contract with Sunrez by refusing to submit the pallet designs for airworthiness certification and to Phase III."); Pl.'s CMSJ at 2–3 ("Had the [g]overnment truly been focused on the objectives of the Contract with the context provided by the STTP, the logical result would be for Sunrez to have been sent for ATTLA certification."). The Court previously deferred ruling on the alleged breach until discovery was conducted given the inquiry is fact-dependent and typically resolved at the summary judgment stage. *See Sunrez*, 157 Fed. Cl. at 662. Following discovery, however, plaintiff has yet to produce any evidence the government breached its implied duty of good faith and fair dealing under the Contract regarding the testing of the pallets. Plaintiff instead argues "[h]ad the [g]overnment truly been focused on the objectives of the Contract with the context provided by the STTP, the logical result would be for Sunrez to have been sent for ATTLA certification and to Phase III." Pl. CMSJ at 3. When asked at oral argument where the Contract promised testing would occur, plaintiff responded "Task 6 is the full scale testing" and the government "assumed" this obligation. Tr. at 125:3–18. The Court, however, already determined Task 6 "implies the

directives are Sunrez's duties to the government, not the government's duties to Sunrez." *Sunrez*, 157 Fed. Cl. at 656. The government further explained the only "obligation for testing is that the provided pallets would meet the testing requirements," "not that Sunrez would provide a pallet and then the [g]overnment would go through all the testing" or "was obligated to test." Tr. at 125:20–126:20. Still, the government *did* perform testing. The government performed first article testing in mid-2017, but the prototype did not pass. *See* Tr. at 127:18–23 ("[GOVERNMENT:]  [T]he government did do the testing. It did first article testing . . . and the composite pallet did not pass the corner pull test. And there was also environmental testing."); *see also* Tr. at 39:25–40:23 (explaining plaintiff's pallet was tested but failed the testing). The government was also under no obligation to continually re-test plaintiff's prototype. *See supra* Section V.C. Given no specific provision of the Contract required further testing beyond the initial testing, the lack of testing on plaintiff's prototypes was not a breach of the implied duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated.").

### C. Whether the Government's Decision Not to Move Forward with Plaintiff's Pallet Was a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff argues the government "seeks to excuse its misconduct with false claims about [] the efficacy of the Sunrez pallet when compared to others" (*i.e.*, UDRI) because it did not receive plaintiff's data in the TDP. Pl.'s Reply at 3. Per plaintiff, USAF "favored less alternatives" and considered "failures by UDRI and the Legacy pallet . . . successes, and successes by Sunrez . . . failures." Pl. CMSJ at 2–3, 30.

At oral argument, plaintiff agreed the Court previously determined it is not a violation for two SBIR phase two contracts to be "essentially in competition with each other." *See* Tr. at 133:4–11; *Sunrez*, 157 Fed. Cl. at 659 ("[P]laintiff was unable to show how two simultaneous Phase II SBIR contracts would violate the Contract or the SBIR phased approach."). Plaintiff further agreed it would "be a legal possibility" and "not in conflict with SBIR provisions" for USAF to pursue competing projects, *see* Tr. at 133:4–21, and two different SBIR contracts for the same procurement could have different standards "depending on what level or what stage of the prototype or design the other SBIR contractor is in," *see* Tr. at 134:17–23. Plaintiff could not "show how two simultaneous Phase II SBIR contracts would violate the Contract or the SBIR phased approach." *See Sunrez*, 157 Fed. Cl. at 659. When asked again at oral argument whether two contracts could be in competition with one another, plaintiff agreed it would "be a legal possibility" and "not in conflict with SBIR provisions" for USAF to pursue competing projects. *See* Tr. at 133:4–21. Per plaintiff, two different SBIR contracts for the same procurement could have different standards "depending on what level or what stage of the prototype or design the other SBIR contractor is in." Tr. at 134:17–23. Although the UDRI contract was not a SBIR contract, *see* Tr. at 135:4–8, plaintiff maintains all contractors for the next-generation pallets should be held to the same standards, *see* 136:25–137:13 ("THE COURT: The[ contractors] must be held to the same standards. [PLAINTIFF:] Yeah, they need to be . . . held to the same level of . . . standards in terms of the testing protocol. . . . [T]he testing protocol should have been applied the same to both[.]"). Plaintiff, however, already agreed USAF could pursue competing contracts with varying standards. *See supra*. Plaintiff's position is also undermined by USAF's reasoning for multiple contracts was to "identify and produce prototype pallets that

- 19 -

c[ould] be produced at or below costs of [the] current 463L pallet." *See* Gov't's MSJ at 35 (citation omitted).  Thus, USAF's decision to choose one contract over another cannot be a breach of the implied duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated.").

### D.  Whether the Government's Alleged Lack of Communication Was a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff broadly argues the government's communication throughout the Contract was a breach of the implied duty of good faith and fair dealing. *See* Pl.'s CMSJ at 6 (explaining USAF "ceased communications with" plaintiff and then "resumed communication after the Contract lapsed," showing USAF "acted dishonestly, deceptively, and evasively in its dealings with Sunrez").  When asked at oral argument, "what requirement did the [g]overnment have regarding communication and what was the breach," plaintiff responded "the breach was basically in the context of several things"—(1) USAF "basically stopped communicating . . . with Sunrez without a [CO] present;" and (2) the "technical reviews[,] the design reviews . . . contained in the [C]ontract, including . . . the end process review [of] the TDP, was never conducted." Tr. at 137:19–138:12.  When pressed on whether USAF was still communicating with plaintiff, plaintiff confirmed USAF was communicating "but not the way they were supposed to." *See* Tr. at 139:7–140:3; Tr. at 140:4–10 ("THE COURT:  But just to confirm, Sunrez acknowledges that during . . . the June 2017 time frame, the Air Force was communicating back and forth . . . with Sunrez?  [PLAINTIFF:]  Yes.").  The evidence therefore demonstrates USAF was in communication with plaintiff—plaintiff just disliked the communications. *See* Tr. at 139:22–140:3 ("[PLAINTIFF:]  And so that was the communication. . . .  It was done . . . not in the contractual context that they were supposed to do it but via email, where they were just nitpicking every little thing they could, and at the same time, accepting a TDP and testing from another contractor that didn't pass anything.").

Plaintiff further alleges specific communications constituted a breach. *See* Tr. at 139:15–23 ("[PLAINTIFF:]  'Well, before we move on to a Phase III . . . we're not going to focus on retesting or approving the configuration, but we want you to just give us the TDP now.'  And so that was the communication.  It was an accelerated TDP.").  These communications, however, occurred after the SBIR data rights clause was added to the contract, meaning plaintiff had a procedure to protect its data rights. *See* Tr. at 140:4–16 ("[GOVERNMENT:]  [I]n August of 2017, the Air Force added the SBIR data rights clause to the contract. . . .  [T]hat was for Sunrez's benefit, to protect their data rights.  The Air Force has data rights.  Sunrez has data rights.  And that clause makes it clear.").  For instance, one communication was a 6 September 2017 email where USAF stated:  "Ring Pull Test III failed, this pallet was returned to [plaintiff] for repair.  Has the pallet been analyzed, repaired, and retested?  What are the results?"  App'x at 1066 (6 September 2017 email).  This email demonstrates USAF was "trying to help Sunrez get the pallet past . . . the first article test and to get a . . . workable technical data package submitted so that [plaintiff could] move on to Phase III," not accelerate delivery of the Draft TDP.  Tr. at 140:22–141:3.  The record also contains other examples of communications between the parties, *see* Gov't's Reply at 6–7 (detailing at least ten instances of communications between the parties regarding the TDP and Contract), further showing the parties, especially USAF, never "ceased"

cooperation or communication. As plaintiff does not articulate how the communications, or alleged lack thereof, was the government's attempt to undermine a specific promise in the Contract, the Court finds the communication between the parties were not a breach of the implied duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated.").

### E.  Whether Plaintiff Can Prove the Government Desired Data Rights Above All Else Proving a Breach of the Implied Duty of Good Faith and Fair Dealing

Despite alleging multiple breaches of the implied duty of good faith and fair dealing, *see supra* Sections VI.A–D, plaintiff argues the overall breach of the implied duty was USAF's desire for plaintiff's data rights above all else. Since the inception of the case, plaintiff has alleged a government "cabal" attempted to improperly obtain data and give it to a third party:

> Starting even prior to inception of the Contract, WRAFB personnel were insistent that Sunrez was to hand over all composite 463L pallet data for the Government to use with unlimited rights. Despite the Government's acknowledgement at the Technical Interchange Meeting that the type of Level III data it was seeking was neither appropriate nor necessary for the Contract, it nevertheless continued to pressure Sunrez into relinquishing its data rights. The Government even went so far as to have its Chief Engineer attempt to compel Sunrez into giving up its data rights in exchange for a hollow promise of a $4.5 million Phase III contract, a mere fraction of what was intended at the outset.
> . . .
> The Government's continued failed attempts to impermissibly obtain Sunrez's intellectual property rights caused the Government to become increasingly hostile with each new, failed attempt. This hostility ultimately culminated in the Government's completely ignoring Sunrez's dozens of attempts to reach it during the Contract's final weeks so as to hide from Sunrez the fact of its final retaliatory act and buy it enough time to manufacture its alleged reasons therefore.

*See Sunrez*, 157 Fed. Cl. at 663. The Court previously explained while "proving a cabal may be difficult, these alleged acts could violate the duty of good faith and fair dealing." *Id.*

When asked at oral argument for the "best piece of evidence regarding the [g]overnment's desire to obtain Sunrez's data above all else" to prove the "cabal," plaintiff referenced various emails. *See* Tr. at 142:18–145. Specifically, plaintiff relies on the email chains from September 2017:

> We want to be able to control all Data and put it into our current MilSpec book as another chapter. Do we lose that ability by getting a COTS book?
> . . .
> Hey there! The only way we can have control of the data is if the company gives us unlimited rights to the data. Otherwise we cannot add it to a technical manual. I was given the impression that the company would not release their drawings so that is why we went with the COTS option. They can, however, give us unlimited rights to the data by letter allowing us to use the data as we see fit. Then we can

- 21 -

> add it to our Mil Spec TO as source data. . . .  If the Company gives us full rights, we could also re-write the contract to just have them give us source data.  I think we need to have another sit down.
>
> . . .
>
> Our team needs to understand some data rights deliverables/CDRL the Phase III Composite Pallet effort.

App'x at 3346–48 (September 2017 Email Chain); *see* 142:14–143:7.  Plaintiff also referenced other emails stating:  "Government purpose rights, what do they include? . . .  After five years in the final contract close out, does the data belong to the [g]overnment?  We are trying to provide a leadership with facts, working towards a direction and a way forward."  *See* Tr. at 144:3–146:15.  Plaintiff argues these emails demonstrate USAF desire for data rights above all else and USAF was "basically demanding" a Level III Draft TDP.  *See* Tr. at 144:3–16 ("[PLAINTIFF:]  So they're obviously trying to get the data rights.  They're obviously trying to figure out a way . . . and that is their focus at that point.  It's not on testing.  It's not on communication.  It's not on . . . having the sit-down with the IPR . . . with Sunrez.  It's on, '[h]ow do we get as much data as we possibly can?'").  These emails, however, do not prove the government was in a "cabal" to obtain data rights.  First, the Contract required a Draft TDP reflecting the final prototype with sufficient detail for open procurement, *see supra* Section V.D; plaintiff therefore cannot maintain USAF improperly sought an alleged Level III TDP in Phase II.  Second, plaintiff argues the emails were only "part of the proof," and the other proof was "the differing levels of treatment between UDRI and" plaintiff.  *See* Tr. at 146:19–147:4.  As described *supra* Section VI.C, however, the differing levels of treatment between contractors cannot prove a government "cabal" because USAF was free to pursue competing contracts containing different standards for the same product.  Finally, plaintiff's examples of a "cabal" do not support USAF undermined a specific promise in the contract.  Accordingly, the Court finds no "cabal," and plaintiff's alleged government "cabal" does not support a breach of the implied duty of good faith and fair dealing.  *See Dobyns*, 915 F.3d at 739 ("[A] specific promise must be undermined for the implied duty [of good faith and fair dealing] to be violated.").

Plaintiff further argues a "bait and switch" occurred when USAF "basically demand[ed]" a Level III TDP "sufficient to . . . give to a third party to build something."  *See* Tr. at 145:11–16.  The Federal Circuit describes a "bait-and-switch" as having two steps:  (1) "the government enters into a contract that awards a significant benefit in exchange for consideration;" and (2) "the government eliminates or rescinds that contractual provision or benefit through a subsequent action predicated at the existing contract."  *PrecisionPine*, 596 F.3d at 829.  Here, step one is satisfied as plaintiff entered into an SBIR Contract with USAF agreeing to develop and deliver six prototype pallets with a corresponding Draft TDP in exchange for $1,488,250.56.  *See supra* Section I.A; Contract at 1–66.  The second step requires the Court to consider USAF's actions following the award of the Contract.  *See Sunrez*, 157 Fed. Cl. at 662.  Plaintiff explains the "bait-and-switch" as:  (1) the "bait" was an extensive SBIR Phase II Contract where the TDP is gradually built into Level III after full production, *see* STTP at 1387–92 (detailing the TDP Timeline for Redesigned 463L Pallet Project); Pl.'s CMSJ at 26–27 ("[USAF] specifically accelerated the expected timeline for Sunrez to deliver a Level III Draft TDP and a Level III TDP, while simultaneously elevating its performance requirements above others to exclude any opportunities."); (2) the "switch" was USAF accelerating the expected timeline for delivery of a

- 22 -

Draft TDP and a Level III TDP, while elevating its performance requirements to obtain unlimited rights in plaintiff's design, and then withdrawing support, directing detailed and premature disclosure to steal Sunrez's design without any payments, and justifying its decisions with falsehoods, *see* Pl.'s CMSJ at 26–27; Pl.'s Reply at 12 (discussing the value of the data rights and USAF's attempts to obtain it for free); App'x 2540–41 (Email discussing MOU); (3) the "breach" was USAF destroying the value of plaintiff's design with false recitation of testing results for plaintiff and UDRI, thereby destroying fruits and reasonable expectation of plaintiff, *see* Pl.'s Reply at 3; Pl.'s CMSJ at 15–21 (reasoning USAF's breach was destroying the fruits and reasonable expectations of the Contract (*i.e.*, pallets should have been submitted for testing and USAF should have followed the SBIR Policy Directive)); and (4) USAF currently possesses data rights to a TDP "it never paid for and should never have received from Sunrez, including its unique ring solution," Pl.'s CMSJ at 26–27; *see* App'x 3329 (Report of Invention and Subcontracts) (detailing disclosure of an abandoned patent for the ring assembly).

Here, as discussed *supra* Section V.D, plaintiff was required to develop and deliver six prototype pallets and a corresponding Draft TDP accurately reflecting the final product to be used in the procurement of the pallets. USAF did not accelerate the delivery of the Draft TDP for free; rather, USAF attempted to obtain a Draft TDP with the level of detail required under the Contract. *See supra* Section V.D. Plaintiff also did not prove USAF destroyed the value of plaintiff's pallet design or plaintiff's "fruits and reasonable expectations" under the Contract. The Contract only contemplated plaintiff would receive $1,488,250.56 and USAF would receive six prototype pallets and a Draft TDP. *See supra* Section I.A. Lastly, no additional benefit was conferred to USAF, who paid for the pallet design and all data produced under the Contract. *See supra* Section I.A. Plaintiff had the opportunity to mark its background data under the Contract to prevent USAF from obtaining rights in such data, but chose not to do so. *See supra* VI.D. In short, there was no "bait-and-switch." As USAF did not "eliminate[] or rescind[] th[e] contractual provision or benefit through a subsequent action directed at the existing contract," *Precision Pine*, 596 F.3d at 829, USAF did not breach the implied duty of good faith and fair dealing, *see Dobyns*, 915 F.3d at 739 (explaining a violation of the implied duty of good faith and fair dealing occurs when a party "interfere[s] with the other party's performance" or "act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract" (quoting *Centex*, 395 F.3d at 1304)).

## VII.  Analysis of the Breach of the Implied Duty of Good Faith and Fair Dealing Based on the SBIR Policy Directive

As discussed *supra* Section VI, plaintiff asserts multiple theories regarding how USAF breached its implied duties of good faith and fair dealing based on the SBIR Data Rights provisions in the SBIR Policy Directive. *See* Pl.'s CMSJ at 17. Plaintiff claims the SBIR Policy Directive "imposed several duties on" USAF and USAF "is bound by these implicit duties, which go beyond the provisions explicitly mentioned in the Contract." *Id.* at 18 (citing PFUF ¶¶ 2–4). Plaintiff argues the Court should consider the data rights provisions of the SBIR Policy Directive as implied duties of good faith and fair dealing because the SBIR Policy Directive was the "law in effect" at the time of contract formation. *Id.* at 17.

Following oral argument, plaintiff filed an unsolicited notice of supplemental authority, "noticing" the Court of the three-factor test from *Disabled American Veterans v. Secretary of Veterans Affairs*, 859 F.3d 1072, 1077 (Fed. Cir. 2017), and arguing the parties are bound by the SBIR Policy Directive. *See* 3 Oct. 2024 Order at 1 (citing Pl.'s Suppl. Auth. at 2–3). The Court accordingly analyzes: (1) whether the SBIR Policy Directive is binding on the parties; and (2) assuming *arguendo* USAF had an implied duty to comply with the SBIR Policy Directive, whether USAF's actions during performance of the parties' Phase II SBIR Contract breached any duty.

## A. Whether the SBIR Policy Directive Is Binding on the Parties

Plaintiff's notice of supplemental authority highlights the three-factor test from *Disabled American Veterans*, to argue the SBIR Policy Directive bound the parties' contract performance in this case. *See* Pl.'s Suppl. Auth. at 2–3. Per plaintiff, the *Disabled American Veterans* test should be used to determine whether an agency's actions constitute substantive—and thus binding—rulemaking under the Administrative Procedure Act: "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency. The first two criteria serve to illuminate the third, for the ultimate focus of the inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law." *Id.* (quoting *Disabled Am. Veterans*, 859 F.3d at 1072), *rev'd en banc*, 981 F.3d 1360 (Fed. Cir. 2020)). In support of its analysis, plaintiff provides evidence the Small Business Administration ("SBA") conducted comment and review for the SBIR Policy Directive data rights provisions—Section 8(b)—before publishing the provisions in the Federal Register on 24 September 2002. *See* Pl.'s Suppl. Auth., Ex. 3 at 27–28 (showing SBIR Policy Directive Section 8(b) provisions in a copy of Volume 67, Number 185 of the Federal Register), ECF No. 90-3; *id.* at 11–12 (showing the SBA's discussion within the Federal Register of the comments it received specific to Section 8(b) of the SBIR Policy Directive prior to the 2002 publication). Plaintiff also provides evidence the SBA conducted additional comment and review for Section 8(b), but ultimately left those provisions unchanged when publishing amendments to the SBIR Policy Directive in the Federal Register on 8 January 2014. *See* Pl.'s Suppl. Auth., Ex. 2 (reproducing the SBA's published amendments to the SBIR Policy Directive in a copy of Volume 79, Number 5 of the Federal Register), ECF No. 90-2; *id.* at 2 (showing the SBA received "several comments" for strengthening the SBIR data rights language in the SBIR Policy Directive, but the SBA decided to "address [the data rights issues] in a subsequent Policy Directive revision").

In response, the Court ordered the government to file "a supplemental response brief . . . addressing . . . the supplemental authority and argument submitted by plaintiff." 3 Oct. 2024 Order at 1. Pursuant to the Court's Order, the government filed its Supplemental Response Brief on 17 October 2024. *See* Gov't's Suppl. Resp. Br. While the government represented at oral argument the SBIR Policy Directive is not binding on USAF, *see* Tr. at 94:9–19, the government does not reiterate such an argument in its supplemental response brief, *see* Gov't's Suppl. Resp. Br. Rather, the government argues whether the SBIR Policy Directive applies to the Contract does not matter because plaintiff "has failed to identify a single inconsistency between the SBIR Policy Directive and its SBIR [P]hase II Contract." *Id.* at 1.

As an initial matter, the Court notes the parties' failure to alert the Court of the Federal Circuit's *en banc* overruling of *Disabled American Veterans* in *National Organization of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs*, 981 F.3d 1360, 1378 (Fed. Cir. 2020) (en banc) ("In so holding, we overrule our contrary decisions in *Disabled American Veterans v. Secretary of Veterans Affairs*, 859 F.3d 1072 (Fed. Cir. 2017) . . . ."). While it is unclear whether the Federal Circuit overruled *Disabled American Veterans* because the test cited by plaintiff was wrong, the test combined with the evidence provided by plaintiff in the exhibits to its notice of supplemental authority—on their face—imply the SBIR Policy Directive was the "law in effect," and thus binding on the parties. The government also appeared to adhere to the SBIR Policy Directive during performance of the Contract because: (1) at oral argument, the government agreed "there are parts of [the SBIR Policy Directive] that have to be included in contracts, including the data rights clause," Tr. at 94:9–24; and (2) in the 28 August 2017 Phase II Amended Contract, USAF agreed to adopt verbatim into the Contract Sections 8(b)(1)–(3) of the SBIR Policy Directive, *see* Gov't's MSJ at 27–28. The Court, however, finds it need not conclude whether the *Disabled American Veterans* test remains good law or whether compliance with the SBIR Policy Directive was an implied duty under the Contract, because—even assuming, *arguendo*, compliance with the SBIR Policy Directive was an implied duty under the Contract—none of plaintiff's alleged violations of the SBIR Policy Directive constitute a breach of the implied duty of good faith and fair dealing.

### B. Whether the Government Breached an Implied Duty of Good Faith and Fair Dealing by Not Complying with the SBIR Policy Directive

Plaintiff asserts USAF violated Section 8(b)(4) of the SBIR Policy Directive—and thus breached its duty of good faith and fair dealing by: (1) failing to include the SBIR data rights clauses, Sections 8(b)(1)–(3) of the SBIR Policy Directive, in the original Contract, *see* Pl.'s Reply at 25–26, Tr. at 88:5–89:1; (2) conditioning a Phase III award on a forfeiture of data rights, *see* Pl.'s Reply at 10; (3) pressuring and coercing plaintiff to give up its data rights, *see id.* at 11; and (4) prematurely negotiating for SBIR Phase III data rights, *see* Tr. at 48:5–17. The Court analyzes each alleged breach in turn.

#### 1. Whether Failing to Include the SBIR Data Rights Clause Was a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff argues USAF violated the SBIR Policy Directive, and as a result breached its implied duty of good faith and fair dealing, by failing to include the SBIR data rights clause in the original Contract. *See* Pl.'s Reply at 25–26. Plaintiff asserts it "should have been able to rest confidently in its SBIR Data Rights and not been targeted for adverse subterfuges and manipulations for its refusal to relinquish" its data right, but "[u]nfortunately this is what happened, and such was a clear breach of the duty of good faith and fair dealing." Pl.'s CMSJ at 15. Plaintiff argues, despite the SBIR data rights clause being added in the 28 August 2017 Amended Contract, USAF "*deliberately* breached its implied duty by excluding the SBIR data clause from the Contract" because it "*knew* it was required to include the SBIR data rights clause at the outset." *Id.* at 25 (emphasis added). As a result of not initially including the data rights clause in the original Contract, USAF may have been in violation of the SBIR Policy Directive; plaintiff, however, does not recite any evidence to support its allegation USAF *intentionally* did

not include the provision for SBIR data rights in the original Contract. *See* Tr. at 117:13–118:21 ("[THE COURT:] [W]as there any evidence that the [g]overnment intentionally did not include the data rights clause in the original contract? [PLAINTIFF:] [T]heir presentation to the SBIR conference showed that they fully intended to own the data package at the end of the project. And so that's certainly intent."). The government agrees it wanted to procure unlimited rights from plaintiff to use the composite pallet for government purposes, but maintains it did not want to steal plaintiff's data rights in the process. *See* Gov't's MSJ at 26–27. The government also acknowledges "its mistake in omitting the SBIR data rights clause from the original [C]ontract," but it was "a mistake which the Air Force admitted and corrected." Gov't's Reply at 9. Section 8(b)(4) of the 2014 SBIR Policy Directive states: "Agencies must insert the provisions of (b)(1), (2), and (3) immediately above as SBIR data rights clauses into all SBIR Phase I, Phase II, and Phase III awards." App'x at 927 (SBIR Policy Directive).

Although initial omission of the data rights clause may have been in conflict with the SBIR Policy Directive, the violation was remedied in the parties' Amended Contract. *See* Tr. at 140:11–13 ("[GOVERNMENT:] [I]n August of 2017, the Air Force added the SBIR data rights clause to the contract. . . . [T]hat was for Sunrez's benefit, to protect their data rights. The Air Force has data rights. Sunrez has data rights. And that clause makes it clear."). The original omission also cannot be a breach of the implied duty of good faith and fair dealing because plaintiff presented no evidence USAF intentionally omitted the SBIR data clause from the original Contract to obtain plaintiff's data. In fact, plaintiff freely chose to enter the original Contract *without* the data rights clause and then chose to enter into the Amended Contract to include the data rights clause to benefit plaintiff. *See* Gov't's MSJ at 20 ("[D]uring the negotiation of contract, either party can insist on a certain term by walking away if the other side does not agree to it. This is not coercion, it is negotiation."). Indeed, the addition of the data rights clause in the Amended Contract benefitted plaintiff—the clause protected plaintiff's data rights without taking any away. In sum, the contract amendment and timeline here demonstrate USAF acted in good faith by agreeing to add the data rights clause and, as such, did not breach the duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 (explaining a violation of the implied duty of good faith and fair dealing occurs when a party "interfere[s] with the other party's performance" or "act[s] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract" (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

### 2. Whether the Government Conditioned a Phase III Award on a Forfeiture of Data Rights in Violation of the Policy Directive Resulting in a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff next argues the communications surrounding the MOU were a violation of the SBIR Policy Directive and USAF's attempt to condition a Phase III award upon plaintiff's data rights. *See* Pl.'s CMSJ at 23. The Court analyzes whether USAF attempted to condition a Phase III award upon plaintiff's forfeiture of data rights. Plaintiff argues USAF "violated its implied duties under the SBIR Policy Directive when . . . it conditioned an SBIR Phase III award upon Sunrez's data rights . . . ." *Id.* at 23–24. Per plaintiff, USAF "offered the MOU to Sunrez to obtain unlimited rights in Sunrez's composite pallets." Pl.'s Reply at 10 (citing App'x at 2535–36 (MOU)).

Section 8(b)(4) of the SBIR Policy Directive states: "An agency must not, in any way, make issuance of an SBIR Phase III award conditional on data rights. If the SBIR awardee wishes to transfer its SBIR data rights to the awarding agency or to a third party, it must do so in writing under a separate agreement." App'x at 927 (SBIR Policy Directive). The MOU— USAF's attempt at summarizing the parties' phone call on 12 July 2017—states: "No exception was taken to ownership of the data remaining with [plaintiff] for the draft TDP. Before a Phase III SBIR contract can be awarded, the draft TDP needs to be delivered and accepted by" USAF. *See* App'x at 2535 (MOU). In plaintiff's contemporaneous response to the government's MOU, its CEO took issue with USAF's language and argued USAF's proposed MOU violates the SBIR Policy Directive Section 8(b)(4)'s prohibition on conditioning a Phase III award on data rights. *See* App'x at 883 (Email Discussing MOU). In this email, the CEO attached a revised MOU which did not contain significant changes to the MOU's original sentence directing plaintiff to deliver the TDP before a Phase III contact could be awarded*, see* App'x at 2535–36 (MOU) ("Before SBIR III effort can be awarded, the draft TDP needs to be delivered and accepted by the [g]overnment."), and actually *removed* USAF's sentence about no issue being taken with plaintiff retaining data rights in the TDP, *see id.* at 2540–41 (email discussing MOU revisions). Plaintiff thus appears to conflate "data" with "data rights." *See* Tr. at 100:8–109:2 (detailing substantive discussion regarding the difference between data and data rights and how you *can* have one without the other). As the Court explained at oral argument, a Draft TDP could include much data, but that does not mean USAF owns the *rights* to the data. *See* Tr. at 102:5–13 ("[THE COURT:] [T]he TDP could include a variety of notes about intellectual property. The TDP might include a reference to multiple different patents . . . . But that does not mean that plaintiff necessarily has to grant the government an exclusive or nonexclusive right to utilize those patents."). The MOU therefore cannot be understood to condition a Phase III award on the forfeiture of data rights because it clarifies: (1) USAF only wanted plaintiff to deliver the *data* in the Phase II, not the *data rights* of the Draft TDP; and (2) USAF took no issue with plaintiff retaining its *data rights* in the Draft TDP. *See* App'x at 883 (Email Discussing MOU). As a result, the Court finds USAF did not violate Section 8(b)(4) of the SBIR Policy Directive and its implied duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 (explaining a violation of the implied duty of good faith and fair dealing occurs when a party "interfere[s] with the other party's performance" or "act[s] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract" (quoting *Centex*, 395 F.3d at 1304)).

### 3. Whether the Government Pressured and Coerced Plaintiff to Give Up its Data Rights in Violation of the SBIR Policy Directive Resulting in a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff argues USAF "violated its implied duties under the SBIR Policy Directive when . . . it . . . coerced or pressured Sunrez to relinquish, transfer, or modify its SBIR data rights in its prototype composite 463L pallets." Pl.'s CMSJ at 23–24 (citing App'x at 1843–44 (SBIR Policy Directive)). Per plaintiff, USAF "sought to pressure Sunrez to sign the[] MOU knowing that if Sunrez disagreed, which it did, [it] would never receive a Phase III and [USAF] would withdraw cooperation," *id.* at 24 (first citing PFUF ¶¶ 18–19; and then citing App'x at 2108), and USAF "pressured and coerced Sunrez for unlimited rights in Sunrez's 463L composite pallet," *id.* at 6. The MOU, however, as explained *supra* Section VII.B.2, acknowledged plaintiff's ability to retain ownership over its data. *See* App'x at 886 (MOU) ("No exception was taken to

ownership of the data remaining with Sunrez for the draft TDP.")  Although, the pre-amendment Phase II contract provided "unlimited rights" in the Draft TDP to USAF, the MOU allows plaintiff to retain rights in the Draft TDP and defers USAF's contract right to unlimited rights "until [P]hase III"—this cannot be considered coercion.  *See id.*; Gov't's Reply at 9.  Section 8(b)(4) of the SBIR Policy Directive states:  "If the SBIR awardee wishes to transfer its SBIR data rights to the awarding agency or to a third party, it must do so in writing pursuant to a separate agreement.  A decision by the awardee to relinquish, transfer, or modify in any way its SBIR data rights must be made without *pressure or coercion* by the agency or any other party."  App'x at 927–28 (SBIR Policy Directive) (emphasis added).  The Court finds plaintiff has not credibly shown USAF "coerced" or "pressured" plaintiff to relinquish, transfer, or modify its SBIR data rights. The MOU explicitly states "[n]o Exception was taken [by USAF as] to the ownership of the data remaining with Sunrez for the [D]raft TDP."  *See* App'x at 877 (MOU).  While plaintiff failed to define—or cite law defining—either "coercion" or "pressure" under the SBIR Policy Directive, *see generally* Pl.'s CMSJ; Pl.'s Reply, the Court determines plaintiff has not credibly argued USAF violated either the SBIR Policy Directive or its implied duty of good faith and fair dealing via "pressure" or "coercion."  *See Dobyns*, 915 F.3d at 739 (explaining a violation of the implied duty of good faith and fair dealing occurs when a party "interfere[s] with the other party's performance" or "act[s] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract" (quoting *Centex*, 395 F.3d at 1304)).

### 4. Whether the Government Prematurely Negotiated for SBIR Phase III Data Rights in Violation of the SBIR Policy Directive Resulting in a Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff finally argues USAF's actions constituted a negotiation of data rights regarding an SBIR Phase III award, which is prohibited by the SBIR Policy Directive.  *See* Pl.'s CMSJ at 26 ("[USAF] clearly understood its implied duties in SBIR contracts under the SBIR Policy Directive, which prohibited the conditioning of an SBIR Phase III award, or *even attempting to negotiate away such rights in Phase II*.") (emphasis added).  At oral argument, plaintiff reiterated its argument.  *See* Tr. at 48:5–48:17 ("[PLAINTIFF:]  I'm saying . . . the SBIR policy is specific in that you're not even supposed to negotiate for the TDP in Phase II.  You're supposed to negotiate . . . for it in Phase III.").  While the original Phase II Contract—as agreed upon by the parties—conferred "[a]ll engineering product definition data created using Government funding as a result of this contract . . . be considered a part of the TDP and shall be delivered to [USAF] *with unlimited rights*," Gov't's MSJ at 15–16 (emphasis in original), this provision "was overridden when the parties added the SBIR data rights clause . . . under which the Air Force does not receive unlimited rights until the end of the SBIR data rights period," Gov't's Reply at 9 (citing App'x at 66 (Amended Contract)).  Section 8(b)(4) of the SBIR Policy Directive states:  "Following issuance of an SBIR Phase III award, the awardee may enter into an agreement with the awarding agency to transfer or modify the data rights contained in that SBIR Phase III award.  Such a bilateral data rights agreement must be entered into only after the SBIR Phase III award, which includes the appropriate SBIR data rights clause, has been signed."  App'x at 928 (SBIR Policy Directive).  The addition of the data rights clause, however, cannot be considered a negotiation in violation of the SBIR Policy Directive—plaintiff asked for the data rights clause to be added to the Contract, and in recognizing its mistake in omitting it in the original Contract, USAF obliged and amended the Contract.  *See* App'x at 66–79 (Amended

Contract). The addition of the data rights clause was also to plaintiff's benefit—the clause allowed plaintiff to protect its underlying data rights and prevent USAF from obtaining unlimited rights in such data. As such, the addition of the data rights clause was not a breach of the implied duty of good faith and fair dealing. *See Dobyns*, 915 F.3d at 739 (explaining a violation of the implied duty of good faith and fair dealing occurs when a party "interfere[s] with the other party's performance" or "act[s] so as to destroy the reasonable expectations of the other party regarding the fruits of the contract" (quoting *Centex*, 395 F.3d at 1304)).

## VIII.    The Government's Motion in Limine

Plaintiff filed its designation of expert witnesses on 16 November 2024. Pl.'s Designation of Expert Witnesses ("Pl.'s Expert Desig."), ECF No. 59. On 14 December 2023, the government filed a motion in limine to exclude plaintiff's expert reports and testimonies. Gov't's Mot. in Limine at 1. Plaintiff responded on 27 December 2023, ECF No. 61, and the government replied on 3 January 2024, ECF No. 62. The Court held a status conference to discuss the government's Motion in Limine on 21 February 2024. *See* 26 Jan. 2024 Order, ECF No. 63.

Plaintiff's Designation of Expert Witnesses lists Mr. Bret Tollgaard, CEO of Sunrez Corporation, and Mr. Bryant Banes, Counsel for Sunrez Corporation. Pl.'s Expert Desig. at 1–2. The government's Motion in Limine objects to Mr. Tollgaard's testimony because his "opinion testimony on legal issues [will] not assist the Court" and "will likely make it difficult for the Court to separate fact from opinion." Gov't's Mot in Limine at 3–4. The government also contends Mr. Banes's testimony on "the reasonableness and necessity of attorneys' fees . . . would not assist the Court in understanding the evidence or determining any fact at issue regarding the merits." *Id.* at 4.

At the status conference, the parties agreed the Court did not need to address the government's Motion in Limine at that time. 22 Feb. 2024 Order at 1–2. The parties agreed: (1) the Court could defer ruling for Mr. Tollgaard's expert testimony until after ruling on dispositive motions or trial; and (2) Mr. Banes's testimony, along with plaintiff's request for attorney's fees, is an issue to be determined after liability, making the Motion in Limine moot. *Id.* at 2. The Court accordingly deferred-in-part and mooted-in-part the government's Motion in Limine. *Id.*

At oral argument, the government agreed "if there [was] no breach of good faith and fair dealing, then the motion in limine [did] not need to be addressed." Tr. at 152:23–153:2. As the Court determines the government did not breach the implied duty of good faith and fair dealing, *see supra* Section VI, the government's Motion in Limine is moot.

## IX.    Plaintiff's Motion to Strike

On 3 May 2024, plaintiff filed a motion to strike in conjunction with its Cross-Motion for Summary Judgment relating to two declarations included in the government's Motion for Summary Judgment Appendix. *See* Pl.'s CMSJ at 29–31. The Court held a status conference on 25 June 2024 to discuss plaintiff's Motion to Strike and scheduling oral argument. *See* 10 June 2024 Order. At the status conference, the parties agreed to defer the Court ruling on the Motion

to Strike until after ruling on dispositive motions or trial. *See* 25 June 2024 Order. Per the parties' agreement, the Court accordingly deferred ruling on the Motion to Strike. *Id.* At oral argument, the government agreed the Court did not need to rely on the declarations at issue in the Motion to Strike. *See* Tr. at 151:5–152:22 ("[THE COURT:] [D]oes the Court need to rely on [the declarations] at all for purposes of summary judgment? . . . [GOVERNMENT:] [N]o."). As the Court did not rely on the government's declarations subject to plaintiff's Motion to Strike, the Motion to Strike is moot.

## X.    Conclusion

For the foregoing reasons, the Court: (1) finds as **MOOT** the government's Motion in Limine, ECF No. 60, and plaintiff's Motion to Strike, ECF No. 74; (2) **GRANTS** the government's Motion for Summary Judgment, ECF No. 69; and (3) **DENIES** plaintiff's Cross-Motion for Summary Judgment, ECF No. 74. The Clerk's Office is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge
